Michael E. ELLIS, Plaintiff,

v.

CITY OF GRAND RAPIDS, a municipal corporation, and Mayor C. H. Sonneveldt, Leonard Anderson, Bernard Barto, Edward C. McCobb, Berton Sevensma, Joseph Sypniewski and William Worst, Commissioners for the City of Grand Rapids, and Donald O'Keefe, Urban Renewal Director for the City of Grand Rapids, and John Paul Jones, Planning Director for the City of Grand Rapids, individually and as officers, agents and employees of the City of Grand Rapids, Defendants.

Civ. A. No. 5369.

United States District Court
W. D. Michigan, S. D.

Aug. 11, 1966.

Woodrow A. Yared, Grand Rapids, Mich., for plaintiff.

Dutchess, Mika, Miles, Meyers & Snow, Grand Rapids, Mich., Wendell A. Miles, Grand Rapids, Mich., of counsel, for defendants.

## OPINION

FOX, District Judge.

This is a motion to dismiss in an action involving a Grand Rapids urban renewal project, commonly known as the Washington Square Urban Renewal Project.

Plaintiff, Michael E. Ellis, a resident of the City of East Grand Rapids, owns a medical office building located at 242 Jefferson Avenue, in the project area.

The defendants are the City of Grand Rapids, the Mayor, the City Commissioners, the Urban Renewal Director, and the Planning Director of the City of Grand Rapids, hereinafter referred to as the "City."

The plaintiff seeks a temporary and permanent injunction against the City to prevent it from implementing resolutions 17370–17374, adopted unanimously by the City Commission on May 17, 1966. Resolution 17370 authorized the filing of an application for a loan and grant from the Housing and Home Finance Agency pursuant to Title I of the Housing Act of 1949, as amended. Resolution 17371 states, among other things, that the area is blighted and is an eligible project area under Act 344 of the Public Acts of Michigan of 1945, as amended, and that in addition to the elimination of blight and slums in the area in question, the undertaking of the project in such area will further promote the public welfare and proper development of the community. Resolution 17373 approved the adoption of "Final Project Report, City of Grand Rapids, Michigan, Part 1—Application for Loan and Grant, Final Project Report, Project No. Michigan R–141, April 1966, Grand Rapids, Michigan, Binder No. 6," hereafter referred to as "Binder No. 6." (Binder No. 6 is plaintiff's Exhibit 1.)

In addition, there are specific findings recited in Resolution 17373 which establish that the area constitutes a serious hazard to the public health, welfare and safety of the City of Grand Rapids and its inhabitants.

Resolution 17374 approves the adoption of a plan promulgated by St. Mary's Hospital for the redevelopment of the properties in the *area owned by it.*

On June 23, 1966, the plaintiff filed his complaint, alleging that he had been denied equal protection and due process of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States, and Article 1, Sections 2 and 17 of the Constitution of the State of Michigan, and that the proposed project violates the First and Fourteenth Amendments to the Constitution of the United States, and Article 1, Section 4 of the Constitution of the State of Michigan. The City then filed a motion to dismiss.[1]

After a hearing on the City's motion, and pursuant to the instructions of the court, both parties submitted briefs which thoroughly discussed all of the issues raised in the pleadings and at the hearing. When the briefs had been submitted to the court, a meeting was held in Chambers, at which time the parties were given a final opportunity to bring to the court's attention any other matters they felt would be relevant.

Because matters outside the pleadings were presented to and not excluded by the court, under Rule 12(b) of the Federal Rules of Civil Procedure the defendants' motion to dismiss is treated as one for summary judgment and disposed of as provided in Rule 56 of the Federal Rules of Civil Procedure.

The City is at the threshold of a development and improvement project which will affect an area of approximately three city blocks. The boundaries are Jefferson Avenue on the west, Wealthy Street on the south, Lafayette on the east, and Cherry Street on the north, excluding St. Mary's Hospital located on the northeast corner of the area, and certain commercial properties located on the northwest and southwest corners.

This Project is designed within the planning proposals included in the adopted Master Plan of the City of Grand Rapids, which indicates that the general land use for the area is to be *semi-public or institutional, in the form of a hospital and related uses.* The City proposes to develop a complete Medical Center.

The project area will act as the southern terminal of a more extensive program to the north in the form of a college and cultural center and additional hospital and medical complex to the north and east of the central business district. These proposals, together, are designed to define, delimit and strengthen the central business district, as well as to contribute to the overall objectives of the City's Master Plan for Urban Renewal.

The objectives of the plan are: to remove serious blight and deterioration in the Washington Square neighborhood; to rid the community of an area of obsolete and substandard structures; to modify the obsolete streetpattern within the Washington Square neighborhood; to provide residential uses; and to improve the general neighborhood through the establishment of a major medical center south of the central business district.

In Count I of the complaint, plaintiff alleges that he has been denied equal protection of the law by the inclusion of

1. The grounds for the defendants' motion to dismiss are as follows:
1. That the Court does not have jurisdiction over this cause, in that:
 a. No Federal question is involved, and
 b. No diversity of citizenship exists.
2. That the plaintiff has failed to exhaust his administrative or state remedies available in the event of any deprivation of his rights.
3. That no right of plaintiff has been violated by the defendants, nor does the proposed action violate any right of the plaintiff, other than that which may be compensated for in due course pursuant to State law.
4. That plaintiff has an adequate remedy of law under the laws and Constitution of the State of Michigan.
5. That plaintiff has failed to state a claim upon which relief can be granted.

his property as property which is to be taken by eminent domain, and the exclusion of certain other properties.

Specifically, the plaintiff asserts that his property meets the same tests employed by the City in excluding an automobile dealership located at the northwest corner of the project on Jefferson Avenue and Cherry Street, a restaurant and bar near the southwest corner on Jefferson Avenue, and a drug store at the southwest corner of Jefferson Avenue and Wealthy Street, hereafter referred to as the "Jefferson Avenue commercial properties."

Moreover, plaintiff asserts that John Paul Jones, Planning Director of the City of Grand Rapids, at a public hearing on the proposed project on April 26, 1966, held pursuant to Michigan Statutes Annotated 5.3504, Comp.Laws Supp.1961, § 125.74, could not explain why two apartment buildings directly behind the plaintiff's property were not included in the project and scheduled for condemnation.

According to the plaintiff's affidavit attached to his complaint, the Planning Director gave the following reasons why the three Jefferson Avenue commercial properties were excluded: (1) they are located on the edge of the project; (2) they are adjacent to and across the street from other commercial property; and (3) they are not blighted. Plaintiff also contends that because his medical office is compatible with the proposed medical center, this is a further reason why his property should not be condemned.

■ First, as to the apartment buildings, it is clear from a study of Binder No. 6 that the apartment buildings do not come within the project boundaries. According to Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), plaintiff has no standing to argue as to where the boundaries of a particular project should be drawn.

In Berman, the Court said:

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the *amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.*" 348 U.S. at 35, 75 S.Ct. at 104, 99 L.Ed. at 39. (Emphasis supplied.)

■ Furthermore, the apartment buildings are scheduled to be demolished by St. Mary's Hospital. See Binder No. 6, Demolition Plan, Exhibit G, Code No. R-224. It is insignificant whether the apartment buildings will be demolished by the City of Grand Rapids or by St. Mary's Hospital. In either case the result is the same.

With respect to the Jefferson Avenue commercial properties, they are listed in Binder No. 6 as "properties for which treatment has not been determined." At Page 11 of Code R-213 of Binder No. 6, it is stated that these properties will be acquired for redevelopment unless they conform to the Renewal Plan. Accordingly, the plaintiff is premature in asserting that these properties are to be excluded from condemnation.

Second, all three properties are on or near the corners of the project, while plaintiff's property, although on the periphery, is in the middle of the project. Third, in the proposed redevelopment plan as set out in Binder No. 6, plaintiff's property is in the middle of the project area designated as a Plaza Park. It is to be acquired by the City for public use in furtherance of urban beautification. It is clear that the plaintiff's medical office building is incompatible with the Master Plan as manifested in Binder No. 6.

■ Berman, supra, teaches that because some land will subsequently be used for professional office buildings, this is insufficient justification for exclusion of the plaintiff's property. Urban renewal is renewal of a whole area in accordance with a specific plan. If each property owner within a chosen area were allowed to successfully attack the plan as plaintiff attempts to do here, ur-

ban renewal would be stymied and impossible of accomplishment. We hold Berman, supra, and Carver, infra, are decisive of the issues presented in this count.

Fourth, in Carver Progressive Club v. Miriani, 192 F.Supp. 825, aff'd. 288 F.2d 889 (CCA 6), cert. den. 368 U.S. 818, 82 S.Ct. 32, 7 L.Ed.2d 24 (1961), the Sixth Circuit Court of Appeals adopted the position that in suits involving urban renewal projects, the parties are better left to their state remedies.

Plaintiff cites Foster v. Hurley, D.C., 207 F.Supp. 71, rev'd. 330 F.2d 87 (CCA 6, 1964), as controlling authority in this matter; however, we consider Foster inapposite.

■ Finally, as plaintiff has admitted in his briefs, it is unnecessary for property to be blighted in order for it to be condemned in urban renewal projects. Michigan Statutes Annotated 5.3502(A), Comp.Laws Supp.Mich. § 125.72; In re Edward J. Jeffries Homes Housing Project, etc., 306 Mich. 638, 11 N.W.2d 272 (1943); Berman v. Parker, supra.

■ Therefore, we hold that as a matter of law the plaintiff has not been denied equal protection of his rights under either the Constitution of Michigan, or the Constitution of the United States. Moreover, in Michigan the jurors in a condemnation proceeding address themselves to two questions: necessity and compensation. Accordingly, if the plaintiff is able to establish that there is no need to take his property, the City will be precluded from acquiring it.

■ Plaintiff also alleges in Count I that from sometime in 1964, the threat of condemnation and the actions of the City have constituted an unlawful taking of the plaintiff's property. If the plaintiff can establish this at the condemnation proceedings, he will be entitled to compensation from 1964 under the authority of In re Elmwood Park Project Section 1, Group B, 376 Mich. 311, 136 N.W.2d 896 (1965). See also M.S.A. 8.-15, Comp.Laws Mich.1948, § 213.25.

■ Plaintiff raises two distinct issues in Count II. First, can a private sectarian hospital participate as a principal redeveloper in an urban renewal program such as the one in question? Second, did the defendants act in such a manner so as to make St. Mary's Hospital's successful bid to be the principal redeveloper of the project a foregone conclusion?

With respect to the first issue, if St. Mary's Hospital is the successful bidder, it is apparent that St. Mary's Hospital will enjoy a benefit in the sense that it will have the opportunity to purchase properties within the area for a lower price than it would have to pay if it had to negotiate with the private owners on an individual basis. The private owners, including the plaintiff, will of course receive full compensation from the City for their properties.

In a case similar to this, involving a church-related University, the Court in response to the contention that the University would receive a benefit, said:

"The argument, however, proceeds on an assumption false in fact. * * * [W]hat the city is buying is not the same as what Fordham is buying. The city buys land and buildings. Fordham buys the same property but subject to its agreement to raze the buildings, relocate the tenants and use the cleared land for a collegiate campus and buildings only. What Fordham is paying for is the re-use value of the land. There is in this record no dispute of the fact, found by both courts below, that the $7 per square foot which Fordham agreed to bid, and did bid, is at least equal to the re-use value as established by several appraisals, all of which reported figures lower than $7 per square foot. Therefore, there is no substance to the assertion, on which the whole suit depends, that Fordham is getting a gift, grant or subsidy of public property. *It is, of course, getting a benefit in the sense that ·it is being permitted to acquire valuable and desirable property at a price which is probably lower than it would have to pay if it had to negotiate with all the private owners,* but the

private owners are getting from the city the full value of the property in its present condition and use." 64th St. Residences, Inc., v. City of New York, 4 N.Y.2d 268, 174 N.Y.S.2d 1, 4, 150 N.E.2d 396, 398–399 (1958). (Emphasis supplied.)

The position St. Mary's Hospital would have as a redeveloper is exactly the same as that of any other redeveloper. On the other hand, because of the credits which St. Mary's Hospital has accumulated under Section 112 of the Housing Act, 42 U.S.C.A. § 1463, the cost of the project as far as the City is concerned, will be considerably less. Whatever St. Mary's Hospital has paid for land and buildings will be credited to the City's share of the project cost, which in turn, determines the federal allotment. Thus, the more St. Mary's Hospital has paid, the less the City will pay, and the less the City of Grand Rapids pays, the more the United States Government pays.

Therefore, it is conceivable that if St. Mary's Hospital's credits are sufficient, and it is chosen as the primary redeveloper, the entire cost of the project could be borne by St. Mary's Hospital and the Federal Government. These facts alone would normally be sufficient to dispose of the plaintiff's argument that public power and funds are being used in aid of a "private sectarian" hospital. However, we hold that participation by a private sectarian hospital as a redeveloper in an urban renewal project is not unconstitutional.

In Berman v. Parker, the Court said at 348 U.S. 33–34, 75 S.Ct. 102, 99 L.Ed. 38:

"We do not sit to determine whether a particular housing project is or is not desirable. The concept of the *public welfare* is broad and inclusive. (Citations omitted.) The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.

"Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. (Citations omitted.) Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. (Citations omitted.) *The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects.*" (Emphasis supplied.)

Further on the Court said at 348 U.S. 34–35, 75 S.Ct. 103, 99 L.Ed. 38–39:

"It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, *churches*, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevent-

ed." (Citations omitted.) (Emphasis supplied.)

See also In re Slum Clearance in City of Detroit, 331 Mich. 714, 50 N.W.2d 340 (1951).

That some of the properties to be condemned were to be used later by private persons for private uses, was, in the opinion of the Court, irrelevant. Indeed, the fact that some of the land might be allocated to churches was also considered unimportant.

Again in Berman v. Parker, the Court said at 348 U.S. 32, 75 S.Ct. 102, 99 L.Ed. 37:

"Subject to specific constitutional limitations, *when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.* In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia * * * or the States legislating concerning local affairs. * * * This principle admits of no exception merely because the power of eminent domain is involved. *The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.*" (Citations omitted.) (Emphasis supplied.)

■ Therefore, it is obvious that the private uses which will finally be involved after a redevelopment project has been implemented are of an incidental or ancillary character, and that of paramount importance is the established public purpose of beautification and redevelopment. Once this primary purpose has been established, it is generally irrelevant what incidental or secondary purposes are involved. The possibility that plaintiff's or any person's property in the area may subsequently be sold to St. Mary's Hospital is inconsequential.

■ Once the area has been reclaimed and cleared, and is available for development, the public purpose has been fulfilled.

In Harrison-Halsted Com. Group v. Housing & Home Finance Agency, 7 Cir., 310 F.2d 99, cert. den. 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414 (1963), the following passage from Zurn v. City of Chicago, 389 Ill. 144, 59 N.E.2d 18, was quoted with approval:

"The achievement of the redevelopment of slum and blight areas, as defined in the act, in our opinion, constitutes a public use and a public purpose, *regardless of the use which may be made of the property after the redevelopment has been achieved.*" (Emphasis supplied.)

Lest the facts in the case at bar become confused, it is noted that the use which St. Mary's Hospital intends to put the land to is neither a private nor a religious use. The proposed use is conspicuously a public secular use. In Binder No. 6, the proposed uses are listed, and they are in every particular non-religious and public in scope.[2]

2. On Pages 9 and 10 of Code R–212 of Binder No. 6, the following uses to which the land involved will be devoted are set forth:

(a) 6.96 acres to the south and west of St. Mary's Hospital will be used for the immediate expansion of medical center facilities, including ambulatory care, treatment, radiology, laboratories, special diagnostic services, diagnostic and mechanical facilities. This area will also provide a site for housing directly related to the medical center, in the form of either professional personnel housing, housing for the aged, or housing for domiciliary care. In addition, parking devoted to the medical center uses shall be provided within this area.

(b) .90 acres will be developed into a public plaza to serve as necessary open space. This plaza will be developed by the City of Grand Rapids in conjunction with the city-wide beautification program.

(c) 1.85 acres will be devoted to the provision of professional office buildings and offstreet parking related to the medical center program.

Binder No. 6 does not support plaintiff's claim that the project is exclusively for the Hospital; part of the project is to be used as a public plaza in furtherance of the overall plan of community beautification; some of the area to be redeveloped will be residential or devoted to professional housing and housing for domiciliary care; and other parts will be devoted to professional offices and commercial uses. Thus, as defendants assert, the terms "medical center," or "medical and related uses," are not synonymous with St. Mary's Hospital.

Harrison-Halsted, supra, teaches it is a sufficient "public use and a public purpose" to proceed with the clearing of a blighted area through urban renewal development. Where an institution, such as a hospital, is the ultimate redeveloper and user, an additional public use exists.

Professor Arthur Sutherland of Harvard University Law School in a letter to House Speaker John W. McCormack,[3] concluded after reviewing the vast area of use of public funds through private institutions (religious as well as unaffiliated) that in each such instance there is an observable end other than the cultivation of religion. Hospital services do not cultivate or teach a particular creed.

St. Mary's Hospital is devoted to a public use in its service to the community at large. In the administration of the hospital, any and all persons are admitted irrespective of their race, creed, color, or religion. This hospital service is a secular and public service.

When Thomas Jefferson authored the Declaration of Independence, he changed the triology of prime inalienable rights of man from "life, liberty and property," as enunciated in the Magna Charta, to "life, liberty, and the pursuit of happiness."

The Continental Congress adopted this triology when it made the Declaration of Independence, America's first clear statement of its purposes and policies as a free people. The Declaration of the Continental Congress concisely articulates that the inalienable rights of man come from the hand of their Creator, and not as a gift from a benign government.

Thomas Jefferson included the health of a free people as a specific right in "our pursuit of happiness," when he said:

"Without health there is no happiness. An attention to health, then, should take the place of every other object."

(Quoted by President Johnson in a special message to Congress on the Nation's Health, 111 Congressional Record 400 (H. Doc. No. 44) Jan. 7, 1965.) This high priority has prevailed in both public and private values throughout the history of this country.

The health of the people was in the minds of our forefathers when they wrote the Preamble of the Constitution of the United States:

"We the People of the United States, in Order to form a more perfect Union, * * * promote the general Welfare * * *."

The health of free people is forever present in the minds of free men. Although this concern springs from the religious nature of our people and the predisposition of that nature to corporal works of mercy, nonetheless it has been, and is, a prime sectarian and public service. When public, private and sectarian hospitals practice mercy toward men, they at the same time perform prime sectarian works and incomparable public services. Eliminate hospitals from our cities and our cities would vanish.

 Promotion and improvement of our people's health is a corresponding duty to our inalienable right to the "pursuit of happiness;" it is a fundamental obligation of governments, national, state

---

3. Letter to John W. McCormack, March 13, 1961, Hearings Before the Subcommittee on Education of the House Committee on Education and Labor, Part I, 87th Cong., 1st Sess. 410–17 (1961).

and local, instituted among men to secure man's inalienable rights. The Congress of the United States and the state legislatures of the several states have in a multitude of ways established means to provide and care for the health of the people.

Our Presidents and Governors likewise have urged and executed laws for the improvement of public health.[4,5,6] In the words of Mr. Chief Justice Warren in *McGowan v. State of Maryland,* 366 U.S. 420, 444–445, 81 S.Ct. 1101, 1115, 6 L.Ed. 2d 410 (1961):

"Throughout this century and longer, both the federal and state governments have oriented their activities very largely toward improvement of the health, safety, recreation and general well-being of our citizens."

All have recognized that hospital care provided by public, private, and private sectarian nonprofit institutions is a public use clothed with an overriding

---

4. Our late and beloved President John F. Kennedy in his Annual Message to Congress on the State of the Union, January 14, 1963, stated:

 "Moreover, all our miracles of medical research will count for little if we cannot reverse the growing nationwide shortage of doctors, dentists, and nurses, and the widespread shortages of nursing homes and *modern urban hospital facilities.*" (Emphasis supplied.) Public Papers of the Presidents, John F. Kennedy, 1963, at Page 14.

5. President Johnson in a special message to Congress on January 7, 1965, proclaimed:

 "Our first concern must be to assure that the advance of medical knowledge leaves none behind. We can—and we must—strive now to assure the availability of and accessibility to the best health care for all Americans, regardless of age or geography or economic status.

 "With this as our goal, we must strengthen our Nation's *health facilities and services,* assure the adequacy and quality of our health manpower, continue to assist our States and communities in meeting their health responsibilities, and respond alertly to the new hazards of our new and complex environment.

 "We must, certainly, continue and intensify our health research facilities. Despite all that has been done, we cannot be complacent before the facts that:

 Forty-eight million people now living will become victims of cancer.

 Nearly 15 million people suffer from heart disease and this, together with strokes, accounts for more than half the deaths in the United States each year.

 Twelve million people suffer arthritis and rheumatic disease and 10 million are burdened with neurological disorders.

 Five and one-half million Americans are afflicted by mental retardation and the number increases by 126,000 new cases each year.

 \* \* \* \* \*

 *"In our urbanized society today, the availability of health care depends uniquely upon the availability and accessibility of modern facilities, located in convenient and efficient places, and on well-organized and adequately supported services.* The lack of such facilities and services is, of itself, a barrier to good health care.

 \* \* \* \* \*

 "Further delay will only compound our problems and *deny our people the health and happiness that could be theirs.*" U.S.Code Congressional and Administrative News, No. 1, Feb. 5, 1965, at 13–14, 16, 21. (Emphasis supplied.)

6. Again, in a special message to Congress on March 1, 1966, President Johnson, delineating the results of legislation passed by the 88th and the 89th Congress, one of which was "[c]onstruction assistance for 1,300 hospital and health facilities to add more than 56,000 new hospital beds", recommended *"legislation to mobilize public and private resources to revitalize our obsolete hospitals. This will require a loan and grant program to assist in the long-term financing of hospital renewal projects."* U.S.Code Congressional and Administrative News, No. 2, March 20, 1966, at 415. (Emphasis supplied.)
 In addition, the President said:

 "The Hill-Burton program for hospital construction is an outstanding example of creative federalism in action. Now in its 19th year, this Federal-State-local partnership has added more than 300,000 hospital and nursing home beds to our Nation and more than 2,000 other health facilities in areas of great need." Id. at 417.

public interest, and courts have sustained the Executive and Legislative branches of our governments in giving aid to such institutions. See Truitt, et al., v. Board of Public Works of Maryland, et al., Md., 221 A.2d 370, filed June 24, 1966; Lien v. City of Ketchikan, Alaska, 383 P.2d 721 (1963); Abernathy v. City of Irvine, Kentucky, 355 S.W.2d 159, cert. den., 371 U.S. 831, 83 S.Ct. 49, 9 L.Ed. 2d 67 (1962); and Kentucky Building Comm'n. v. Effron, 310 Ky. 355, 220 S.W. 2d 836 (1949).

■ Thus, we see that the concerted effort for renewal and expansion of hospital and medical care centers as a part of our nation's system of hospitals, is as a public service and use within the highest meaning of such terms.

Surely this is in accord with an objective of the United States Constitution: "* * * promote the general Welfare."

In the last half of the second decade of the twentieth century, it is far too late to deny that hospital service for the benefit of all the people, whoever they may be, is not a public service, and that the use of properties and facilities for health purposes is not a public use.

The overwhelming weight of history is to the contrary.

Obviously, the primary purpose of the project is to promote and serve the public welfare by assuring that the City will have adequate medical and hospital facilities to meet its present and future demands.

Plaintiff says that but for St. Mary's Hospital there would be no Washington Square Project. Plaintiff misconceives the compelling motivation for the City's action. It is the public need of the people for hospital services in this community and the nation which demands expansion and improvement of hospital facilities and the establishment of medical centers. It is the blighted condition of the area involved which calls for renewal. Through the project the City will accomplish two public purposes: removal of blight, and the establishment of a much needed medical center.

■ St. Mary's Hospital is unquestionably an integral part of the available hospital resources of the City. The City definitely has the right to act in the interest of the general public welfare even if this has the incidental and indirect effect of benefiting a religious interest.

As was stated in Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711, 724–725 (1947):

"Of course, cutting off church schools from these services, so separate and so indisputably marked off from religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary."

The situation in the case at bar is in many respects analogous to the facts in McGowan v. State of Maryland, supra. There the Supreme Court of the United States held that despite their religious origin, Sunday closing laws were constitutional since their purpose had become secular, that is, to provide a uniform day of rest for all of the citizens of the State. Mr. Chief Justice Warren speaking for the Court, said:

"* * * the fact that this day is Sunday, a day of particular significance for the dominant Christian sects, does not bar the State from achieving its secular goals." 366 U.S. at 445, 81 S.Ct. at 1115, 6 L.Ed.2d at 410.

Although the treatment of patients by church-affiliated hospitals may not have always been secular in nature, it is evident that today such treatment is completely devoid of any religious significance.

In Lien v. City of Ketchikan, Alaska, supra, the city had leased a hospital constructed with state, federal and local funds to a religious order for a term of

ten years at $1 a year. The court said at 383 P.2d 724:

> "The hospital was constructed and the lease made in order to provide for the care of the sick, without regard to race, color or creed, and thus accomplish a valid public purpose. There is nothing in this arrangement from which it can be inferred that a tax-established, public institution is to be utilized to aid a religious group to spread its faith or to interfere with the religious beliefs of others. The city's action was not designed, nor does it have the effect by its nature, of promoting or giving a preferred position to whatever religious beliefs the individual members of the corporation might have. The fact that specific sectarian beliefs may be entertained by those persons does not bar the city from achieving its valid secular goal of caring for the sick."

See also Abernathy v. City of Irvine, Kentucky, supra; Kentucky Bldg. Comm. v. Effron, supra.

In Kentucky Bldg. Comm. v. Effron, the court said, in upholding the use of state funds for the construction of non-profit hospitals, including a private sectarian hospital:

> "Manifestly, the drafters of our Constitution did not intend to go so far as to prevent a public benefit, like a hospital in which the followers of all faiths and creeds are admitted, from receiving State aid merely because it was originally founded by a certain denomination whose members now serve on its board of trustees." 220 S.W.2d at 838.

Finally, if St. Mary's Hospital were denied the right to participate in the project, this could raise serious constitutional questions as to whether its right to equal protection and freedom of religion had been violated. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed. 2d 965.

By the second issue in Count II, plaintiff has in effect alleged that the City has already predetermined that St. Mary's Hospital will be the primary redeveloper in violation of M.S.A. 5.3501 et seq., Comp.Laws Mich.1948, § 125.71 et seq., which provides for free and open competitive bidding among potential redevelopers.

In order to understand the relationship between St. Mary's Hospital and the City, a brief explanation of how Section 112 of the Housing Act operates is necessary.

The City has applied for a loan and grant under this Section. Section 112 provides in part that:

> "(a) In any case where an educational institution or a hospital is located in or near an urban renewal project area and the governing body of the locality determines that * * * the undertaking of an urban renewal project in such area will further promote the public welfare * * * (1) *by making land in such area available for disposition,* for uses in accordance with the urban renewal plan, *to such * * hospital for redevelopment * * *,* (2) by providing, through the redevelopment of the area in accordance with the urban renewal plan, a cohesive neighborhood environment compatible with the functions and needs of such * * * hospital, or (3) by any combination of the foregoing, the Administrator is authorized to extend financial assistance under this subchapter for an urban renewal project in such area without regard to the requirements in section 1460 of this title with respect to the predominantly residential re-use of urban renewal areas. *The aggregate expenditures made by any such * * * hospital * * * for the acquisition * * * of land, buildings, and structures to be redeveloped or rehabilitated by such * * * hospital for hospital uses in accordance with the urban renewal plan * * * and for the demolition of such buildings * * * shall be a local grant-in-aid * * *.*" (Emphasis supplied.)

In order for the City to be eligible for a grant or loan, it had to assure the Housing and Home Finance Agency that the land would be used for *public and non-profit institutional uses.* Chapter 14–3–3

of the Urban Renewal Manual sets out this requirement as follows:

"The disposal and redevelopment of land for public and nonprofit institutional uses must be assured *before* HHFA will concur in the obligating of loan funds for land acquisition or before HHFA will pay any grant funds to the LPA [Local Public Agency] under a Capital Grant Contract. * * *

"*After* receiving HHFA concurrence, the LPA shall *comply with the public disclosure requirements* of Section 14–4–1. When this requirement is met, the LPA may consummate the disposal." (Emphasis supplied.)

By submitting Binder No. 6 to the Regional Director of the Urban Renewal Department of Housing and Urban Development and including not only its plans, but the plans of St. Mary's Hospital, the City complied with the above procedures. It in no way committed or bound itself to St. Mary's Hospital as the principal redeveloper of the project.

Indeed, Chapter 14–1–1 of the Urban Renewal Manual requires that disposals of project land be made in an open and fair way:

"The public interest requires that disposals of project land be consummated in a fair and equitable manner and be open, in one way or another, to public scrutiny * * *. *Each disposal of land shall be at a price that is not less than the fair value of the land for uses in accordance with the Urban Renewal Plan.* * * *

"When land is to be devoted to a public or nonprofit institutional use, the fair value of the land shall be based on its value for the most suitable alternative private use or uses for the land. * * *

"A valuation so derived shall always leave the project at least as well off financially as it would be if the land has been designated for private redevelopment.

"The LPA shall avail itself of the services and specialized skills of appraisers, market analysts, special legal counsel, and real estate marketing consultants to the extent, and in the manner, reasonably necessary to make informed an judgment."

In Kintzele v. City of St. Louis, Mo., 347 S.W.2d 695, where claimants attempted to invalidate a disposition of property, partly on the ground that other redevelopers—real or imagined—were prevented from competing for the land, the court said:

"There was some thinking, some recognition of possibilities and probabilities, but there was no agreement or contract in advance of proper time."

See also 64th St. Residences v. City of New York, 4 N.Y.2d 268, 174 N.Y.S.2d 1, 150 N.E.2d 396, cert. den. Harris v. City of New York, 357 U.S. 907, 78 S.Ct. 1152, 2 L.Ed.2d 1157, (1958); Bleecker Luncheonette v. Wagner, 141 N.Y.S.2d 293 (Sup.Ct.1955).

From a full consideration of the contents of Binder No. 6 it is evident that St. Mary's Hospital is plainly in the position of a nonprofit institution which has tendered an offer to become a redeveloper of part of the proposed project. There is evidence of thinking, exploration, and recognition of possibilities and probabilities of prospective redevelopment between St. Mary's Hospital and the City.

These circumstances, however, do not ripen into a contract between St. Mary's Hospital and the City. A redeveloper's contract can only become final and valid after the City acquires fee simple title and conforms to all the procedural requirements of state and federal laws, rules and regulations.

St. Mary's Hospital is in the same position today, namely, a bidder hopeful of becoming a redeveloper, as were Old Kent Bank and Trust Company, Union Bank & Trust Company, or the Grand Rapids Press before condemnation and clearance of land in the central core of the City of Grand Rapids commonly known

as Vandenberg Center.[7] These business enterprises became redevelopers in the downtown urban renewal area.

The Hospital's location "in or near an urban renewal project area," and the preservation of its credit rating under Section 112 of the Housing Act may place it in a position of possibly or probably being best suited to develop the land to its maximum use in conformance with the declared objectives of the urban renewal plan as a medical center.

It is prudent for the City to achieve maximum benefits at minimum costs, to utilize existing community resources, and to obtain the highest bid for acquired urban renewal land.

■ Plaintiff's emphasis on the fact that seven structures owned by St. Mary's Hospital in Block I were counted in Binder No. 6 in determining whether the area was blighted, but excluded from

condemnation, ignores the scope of Section 112. All of the seven structures are scheduled to be cleared and redeveloped by St. Mary's Hospital if it is chosen as a redeveloper. Congress contemplated this kind of result when it passed Section 112.

The Berman court held "the public end" may be better served by a private agency than by a department of government—or so the Congress might determine. Berman v. Parker, supra, page 11, at 348 U.S. 33–34, 75 S.Ct. 98.

■ By Section 112 of the Housing Act, Congress has determined that it is in the public interest to permit money spent for land acquisition and clearance by an educational institution or a hospital located in or near the urban renewal project area to be a part of the general urban renewal plan, if the governing body of the locality determines that will promote the "general welfare." [8]

7. "Major would-be redevelopers' plans have been in existence in *each* urban renewal project. The Federal Government does not approve of vacating and clearing vast areas in cities without it being clearly shown that there is a demonstrated need for re-use. This was true in the area now occupied by the new Justice Building. This was true in the areas now occupied by the Old Kent Bank and Trust Company. This was true in the area now occupied by the Grand Rapids Press. This is true of the area now occupied by the Union Bank and Trust Company. All of the before mentioned institutions were bidding long before condemnation was commenced. None of them were any more assured of ultimately occupying their sites than is St. Mary's. All of them were as *hopeful* as St. Mary's is *hopeful* that it will be the successful bidder." Defendants' Reply Brief, filed August 5, 1966, Pages 10–11.

8. During debate in the Senate in the consideration of Section 112, Senator Douglas from Illinois said:
"What the present provision does is to permit the money which the universities will themselves pay to be a part of the general urban renewal program, but to do this under the supervision of the city, in accordance with the city plan, and as a part of an approved local program. The universities are not given a hunter's license and allowed to go out and clear any territory they wish to clear. * * *
"As I understand, the Senator from Connecticut is saying that if the financial contributions of these public institutions were counted as a part of a city's contribution to urban renewal, there would be more city funds available elsewhere, and hence there would be more land cleared. Would it be a terrible thing to have more slums cleared and removed.?"
Senator Clark from Pennsylvania added:
"[T]he present provision in the bill would not require the Federal Government to put up 1 cent of cash that it would not have to put up if the provision were not in the bill, and the net result will be that out of the $550 million in additional authorization which the bill provides for urban renewal, some small part of it may go for the rehabilitation of institutions of higher learning instead of none." (105 Cong. Rec. 16156–59 (1959).)
Although the remarks of Senators Douglas and Clark were directed at the educational provisions of Section 112 of the Housing Act, because the Act affects hospitals in exactly the same fashion as it does colleges and universities, we consider their comments relevant to this case.

The "public end" and "general welfare" are the paramount concern of Congress and the City of Grand Rapids. The City of Grand Rapids is within its legal competence when in planning the Washington Square Project, it concurrently considers St. Mary's Hospital as a possible or probable redeveloper within the area. The City in this regard in no way impinges any of the plaintiff's federal or state constitutional or statutory rights.

Again, plaintiff is premature in asserting his claim raised by the second issue contained in Count II of his complaint.

In Count III of his complaint, plaintiff alleges that he has been denied due process of the law. The Supreme Court in Berman, supra, answered plaintiff's claim in this Count when Justice Douglas, speaking for a unanimous court, said:

> "The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." 348 U.S. at 36, 75 S.Ct. at 104, 99 L.Ed. at 39.

Of course, this language applies with equal force to the Fourteenth Amendment issue in the instant case.

Due process is secured to the plaintiff by the procedural safeguards provided in Michigan's condemnation laws (M.S.A. 8.11, et seq. Comp.Laws Mich.1948, § 213.21) which require the impanelling of a jury to resolve questions of necessity and just compensation.

Additional reasons have been urged by the plaintiff for relief in a federal court action. We have considered them and hold them to be without merit.

Also, the City has presented additional reasons in support of its motion; however, in view of our holdings, we shall not discuss them.

For the reasons stated in this opinion, we find no genuine question of fact on the federal issues raised by plaintiff in this case. A summary judgment is granted in favor of defendants by reason of Rules 12(b) and 56 of the Federal Rules of Civil Procedure.

The defendants are directed forthwith to prepare a proposed summary judgment in accordance with this opinion.