**TULSA AREA HOSPITAL COUNCIL, INC., an Oklahoma non-profit Corporation, Appellee,**

v.

**ORAL ROBERTS UNIVERSITY, Appellant,**

and

**Oklahoma Health Planning Commission, Appellant.**

No. 53059.

Supreme Court of Oklahoma.

March 24, 1981.

As Corrected March 25 and April 9, 1981.

Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick by William G. Paul and Richard C. Ford, Oklahoma City, and Boone, Smith, Davis & Minter by L. K. Smith, Tulsa, for appellee.

Moyers, Martin, Conway, Santee & Imel by Jack H. Santee and James R. Miller, Tulsa, for appellant, Oral Roberts University.

Jan Eric Cartwright, Atty. Gen., of Oklahoma by Thomas H. Tucker, Gerald E. Kelley and Amalija J. Hodgins, Oklahoma City, for appellant, Oklahoma Health Planning Commission.

HODGES, Justice.

The Tulsa Area Hospital Council, Inc., an Oklahoma non-profit corporation, appealed to the District Court of Tulsa County from an order of the Oklahoma Health Planning

Commission [OHPC]. OHPC granted a certificate of need, pursuant to 63 O.S.Supp. 1975 § 2651,[1] to Oral Roberts University [ORU] for the construction of a 294-bed hospital in which holistic medicine would be practiced. The order granting the certificate to the City of Faith Hospital was vacated on appeal and the cause remanded to OHPC for further findings because the District Court found that the granting of the certificate was: 1) "clearly erroneous in view of the reliable material, probative and substantial evidence, and 2) in violation of the Establishment Clause of the First Amendment of the United States Constitution."

A dual regulatory system controls new hospital construction. No new institutional health services may be offered or developed unless a certificate of need is obtained from OHPC. This state agency is comprised of the department heads of the Oklahoma departments of Health, Mental Health and Human Services.[2] Under the National Health Planning & Resources Development Act of 1974, the Secretary of Health & Welfare is empowered to withhold reimbursement under medicare, medicaid, and other federal health payments for that portion of patient charges reflecting expenses relating to new capital expenditures unless the state agency, i. e., OHPC, makes a favorable recommendation of the need for such expenditures.[3] OHPC has the statutory duty to assure the orderly development of health services and the responsibility for operating and implementing a state program of health planning and of administering all health planning functions.[4]

Promptly upon the receipt of any certificate of need application, OHPC is required to thoroughly investigate the need of the proposed services. The investigation, pursuant to 63 O.S.Supp.1975 § 2652, must include:

(a) the adequacy of institutional health services in the locality,

(b) the availability of services which may serve as alternatives or substitutes,

(c) the adequacy of financial resources for the new services,

(d) the availability of sufficient manpower to properly staff and operate the proposed new services,

(e) the availability of both allopathic and osteopathic facilities and services to protect the freedom of patient choice in the locality, and

(f) any other matter which the Commission deems appropriate.

I

The stated avowed major purposes of the City of Faith Hospital are to provide: 1) unique health care delivery to meet the needs of an existing national constituency; 2) clinical medical education for doctors, nurses and health personnel, and 3) an accessible situs for clinical research. OHPC specifically found a constituent demand existed for a hospital facility to provide holistic treatment, a unique approach to the delivery of health care to the whole patient through ministry to the body, mind, and spirit. This treatment involves the incorporation of prayer and touching into standard and recognized medical procedures. Although the District Court did not disturb the validity of the finding, it held that the ground upon which OHPC decided constituent need was clearly erroneous. Because OHPC failed to determine the size and geographical source of the constituent demand in patient numbers, and to then measure that demand against the existing hospital beds in the Tulsa area in order to calculate the number of beds needed in Tulsa, the court found the granting of the certificate of need was not supported by substantial evidence.

---

1. Amended 63 O.S.Supp.1980 § 2654.

2. See 63 O.S.Supp.1975 § 2651, et seq.

3. See 42 U.S.C. § 1320a–1 [§ 1122 of the Social Security Act.]

4. See 63 O.S.Supp.1978 § 2653, and 63 O.S. Supp.1978 §§ 1–112, 1–113.

The applicable statute, 63 O.S.Supp.1975 § 2652, supra,[5] lists several factors which must be investigated before a certificate of need may be granted. The number of beds is not a specific requirement, but an investigation of the adequacy of institutional health services in the locality is required. It is undisputed by the parties that there are no holistic institutional health services provided either in Tulsa or in the United States. A review of the daily hospital reports made by the major Tulsa hospitals, indicating the number of beds available, reflected that the Tulsa hospitals have average occupancy rates of 95.5%, 93.8%, 93.7%, 90.0%, and 72.9%.

Although two Tulsa County hospitals subsequently offered to permit the training of ORU medical students and to permit practice by holistic physicians, OHPC found this to be an unsatisfactory substitute or alternative because holistic medicine requires the presence of medical personnel acting together as a team in proximity with the patient. Existing hospitals are unwilling to allocate geographic units for the holistic treatment of patients or the education of medical personnel. The holistic concept of care involves a team effort in which a complete environment exists where each person in the health care delivery is dedicated to the same philosophy of healing. Existing hospitals, because of their architectural structure and of their unwillingness to allocate geographic units for holistic treatment of patients or the education of medical personnel, are unable to provide a health care facility in which this total team concept can be expedited. The element of proximity is of alleged critical importance. It is asserted that proximity promotes regular contact among those on the health care team and with the patient, increasing the opportunity to touch. It is alleged that the laying on of hands by touching the patient is a method of transferring concern and compassion. The court erred when it found that all that was needed to provide the prayer stream was unrestricted access of the prayer partner to the patient. This concept fails to recognize that the evidence presented was that holistic medicine as conceived by ORU requires a complete complement of health professionals dedicated to a team effort in a controlled atmosphere.

OHPC found that the existence of a constituency was apparent from the receipt of OHPC of approximately 400,000 handwritten letters from people who believed that their medical and physical needs cannot be met in other hospitals. The Cooper & Lybrand survey reported that 91.4% of the national constituency, if seriously ill, would consider coming to the City of Faith or bring members of their families. Analysis of the mail by the OHPC staff reflected that if the hospital were in existence over half of the beds would be occupied by presently ill letter writers. The National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300n–1(c)(7), provides that special consideration be given to facilities which fulfill special needs to individuals who do not reside in the area where the proposed health care is to be provided.

A survey of medical and nursing personnel revealed that there was enough manpower to operate and staff the proposed new services. Services requiring extreme outlays for expensive equipment such as CAT scanners and linear accelerators were planned to be delayed with utilization of present medical facilities until the significant need occurred. Neither burn nor obstetrical facilities were contemplated.

The statute also provides for consideration of the availability of both allopathic and osteopathic facilities to provide freedom of choice to the patient, and whether financial resources for the new services are adequate. It is apparent that OHPC had the authority to consider under (e) and (f) of the statute the possibility that the patients' freedom of choice might include holistic medicine, and that the special needs of a national constituency were relevant. The adequacy of funding was not disputed.

5.  Amended 63 O.S.Supp.1980 § 2652.

■ Great weight is to be accorded the expertise of an administrative agency, and a presumption of validity attaches to the exercise of expertise when the administrative agency is reviewed by the judiciary. A court of review may not substitute its own judgment for that of an agency, particularly in the area of expertise which the agency supervises.[6] The rationale for this rule is that courts do not possess the specialized knowledge, training, experience or competency to substitute opinions for the judgment of qualified experts. The legislature has recognized that the expertise in some cases of legislative authority is better left to those who have refined abilities in narrow areas, controlled only by general guidelines established by the legislature.[7] If the facts determined by the administrative agency are supported by substantial evidence, and the order is otherwise free of error, the decision of the agency must be affirmed.[8]

■ To properly issue a certificate of need, OHPC must find, after its investigation, that the action proposed in the application is necessary and desirable in order to provide the required institutional health services in the area to be served; the proposed action can be economically accomplished and maintained; and that it will contribute to the orderly development of health services in the area.[9] We find that OHPC complied with the statutory requirements, and that the granting of the certificate of need was not clearly erroneous in view of the reliable material, probative and substantial evidence.

## II

We next address the finding of the trial court that OHPC contravened the Establishment Clause of the First Amendment by granting the certificate of need.

■ Although the Establishment Clause requires that the State be neutral in its relations with groups of religious believers and non-believers, the State and its agencies are not required to be hostile adversaries.[10] Public welfare is broad and inclusive, the values it represents are spiritual, physical, aesthetic and monetary. The history of the Establishment Clause contains many constitutionally permissible examples of accommodations on the part of government to religion.[11] Public support for sectarian hospitals has long been the policy and practice.[12]

The three primary prohibitions against which the Establishment Clause was intended to provide protection are the sponsorship, financial support and active involvement of

6. *Federal Power Commission v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972); *Oklahoma Water Resources Bd. v. Central Oklahoma Master Conservancy Dist.*, 464 P.2d 748, 752–53 (Okla. 1969); 75 O.S.1971 § 322(1)(e).

7. *Valley State Bank of Canton v. Farmers State Bank*, 87 S.D. 614, 213 N.W.2d 459 (1973); *First American Bank & Trust Co. v. Ellwein*, 198 N.W.2d 84, 106 (N.D.1972).

8. *Oklahoma Inspection Bureau v. State Bd. for Property & Casualty Rates*, 406 P.2d 453, 457 (Okla.1965).

9. 63 O.S.Supp.1975 § 2653; amended 63 O.S. Supp.1980 § 2653.

10. *Truitt v. Bd. of Public Works*, 243 Md. 375, 221 A.2d 370 (1966).

11. See *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), upholding the release time program for public school students to receive religious instruction during school

hours. *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) exemption from draft for conscientious objectors based on a grounding in religious training and belief. Exemptions also include Christian Science Sanatoriums operated or listed and certified by the First Church of Christ Scientist, Boston, Massachusetts. [See 42 U.S.C. § 300n–(4)]. Oklahoma statutory accommodations include 10 O.S.Supp.1978 § 1119 placing children in custody of persons of the same religious faith as the natural parents, exemption from testing of newborn for phenylketonuria and syphilis, 63 O.S.1971 §§ 1–534, 1–516.1; the right to select treatment for tuberculosis based on spiritual means. 63 O.S.1971 § 1–405; and treatment by prayer in nursing homes, 63 O.S. 1971 § 1–812.

12. The argument that every form of financial aid to church-sponsored activities violates the Establishment Clause was rejected in *Bradfield v. Roberts*, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899).

the sovereign in religious activity. Cumulative criteria promulgated by the United States Supreme Court has resulted in the development of a three-part test in considering alleged Establishment Clause infringements.[13] Under this scrutiny, the action of OHPC in granting the certificate of need must:

A) have reflected a clearly secular purpose;

B) have had a primary effect that neither advanced nor inhibited religion; and

C) have avoided excessive government entanglement with religion.[14]

## A

■■■ The requirement that granting of the certificate of need must have a secular purpose is to prevent government action aimed at religious promotion. The secular purpose test requires that the State have a non-sectarian reason for its action. Although the State may only act pursuant to secular goals, incidental conformity with religious purposes does not render the action unconstitutional. The Establishment Clause does not bar state or federal regulation of conduct which happens to coincide with religious beliefs. It has been concluded by the Congress and the Legislature, in many instances, that the general welfare of society demands regulation. For example, murder, theft, perjury, and adultery, constitute violations of secular law. The fact that these temporal violations are also violative of the tenets of the Judeo-Christian religions does not invalidate the regulation.[15]

The health of the populace is an over-riding secular goal. Promotion and improvement of the people's health is a corresponding handmaiden to the inalienable right to the pursuit of happiness. The promotion and improvement of the health of the citizens is a fundamental obligation of the local, state, and federal governments.[16] The State of Oklahoma has recognized these secular public necessities by requiring an investigation of proposed new medical services and institutions before a certificate of need may be issued. The federal government has recognized this by permitting exceptions where special constituent needs are shown.[17] The combined efforts of the private sector and state and federal results in construction of hospitals and health care for the common good. The coincidence of secular and religious purposes does not threaten those evils which promote interdependence of Church and State. The provision by the State of the presentation of the opportunity of its citizens to seek health services in accordance with their preferences is clearly an acceptable secular purpose when examined within the dictates of the Establishment Clause. When viewed with these precepts, we find no governmental action promoting a religion.

## B

The granting of the certificate of need did not advance or inhibit religion. The fact that some religious group might receive some incidental benefit as the result of construction of the hospital is not controlling. The primary effect achieved by construction of medical facilities is the promotion of the public welfare, not the advancement or inhibition of religion. The focus of the test is the *function*, secular or religious, which the government aid subsi-

13. *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701 (1970).

14. *Roemer v. Bd. of Public Works of Md.*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971).

15. *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961).

16. *McGowan v. Maryland, ibid; Ellis v. City of Grand Rapids*, 257 F.Supp. 564 (W.D.Mich. 1966).

17. See note 2, supra. Hospital care provided by public, private, and private sectarian non-profit institutions is a public use which provides incomparable public services.

dizes—not the nature of the institution, secular or religious, which receives the aid.[18] OHPC maintained a neutral position in granting the certificate of need.

### C

The question presented is primarily a medical issue. The involvement by the State is to permit the orderly development of medical facilities for the promotion of the public welfare. The investigation and granting of the certificate of need by OHPC does not constitute an excessive entanglement with religion.[19] There is no attempt by OHPC to either supervise or interact with the City of Faith on a continuing basis, and any contact between Church and State is minimal. The involvement in this case is no greater than there is when the State reviews secular education requirements of parochial schools, permits the incorporation of a religious group or the requirement that churches acquire building permits. There is no continuing governmental surveillance, nor is any evidence of excessive governmental entanglement with religion presented under the facts before us.

The granting of the certificate of need by OHPC did not violate the Establishment Clause.

REVERSED.

BARNES, V. C. J., and WILLIAMS, LAVENDER, SIMMS and HARGRAVE, JJ., concur.

IRWIN, C. J., and DOOLIN and OPALA, JJ., dissent.

OPALA, Justice, dissenting:

The court holds that Oral Roberts University [ORU] is entitled to a certificate of need [CON] for the construction of a 294-bed hospital in Tulsa. I am unable to join in this pronouncement. My view is that [a] the district court order here on review is but interlocutory and hence unappealable and [b] the postural constraints in which the case comes here either render it moot or, at the very least, severely impair a free and deliberate judicial choice from a full range of available alternatives.

### I.

THIS APPEAL IS SOUGHT TO BE PROSECUTED FROM AN UNAPPEALABLE DISTRICT COURT DECISION ON REVIEW OF AN ADMINISTRATIVE AGENCY'S ORDER

The district court order from which the appeal is sought to be prosecuted remanded this cause to the agency whence it came, the Oklahoma Health Planning Commission [OHPC], with directions to take additional evidence and to make new findings of fact. This procedure is explicitly sanctioned by the provisions of 75 O.S.1971 § 322(2). No appeal lies to this court from a nonfinal order of the district court on review of an agency decision. 75 O.S.1971 § 323. The remand left the case undetermined and *sub judice*. The district court order must hence be regarded as interlocutory. *Hughes Motor Co. v. Warner*, 187 Okl. 255, 102 P.2d 594, 595 [1940]; *Kansas Explorations, Inc. v. Blaine*, 195 Okl. 428, 158 P.2d 907 [1945]; *Reid v. Phillips Petroleum Company*, Okl., 531 P.2d 340, 341 [1975]. Language similar, if not identical to that in our § 323, supra, found in federal statutory law, 28 U.S.C. 1291, is construed in accord with my view. *Bohms v. Gardner*, 381 F.2d 283, 285 [8th

---

18. *Hunt v. McNair*, 413 U.S. 734, 742–43, 93 S.Ct. 2868, 2873–74, 37 L.Ed.2d 923 (1973); *Cummins v. Parker-Seal Co.*, 516 F.2d 544, 553 (6th Cir. 1975).

19. *Lemon v. Kurtzman, supra.*

Cir. 1967]; *Mayersky v. Celebrezze*, 353 F.2d 89 [3rd Cir. 1965]; *Marshall v. Celebrezze*, 351 F.2d 467, 468 [3rd Cir. 1965].[1]

My conclusion is that this appeal should have been dismissed. This court's order of January 12, 1979[2]—which denied appellee's motion to dismiss—was in error. Unless there is an express indication to the contrary, an order of this court that denies appellee's motion to dismiss is always subject to reconsideration. *Sawyer v. Sawyer*, 182 Okl. 348, 77 P.2d 703, 704 [1938]; *Mount v. Schulte*, 193 Okl. 335, 143 P.2d 424, 426 [1943]; *Red Eagle v. Cannon*, 198 Okl. 330, 177 P.2d 841, 842 [1947]; *Chicago, R. I. & P. R. Co. v. American Airlines, Inc.*, Okl., 408 P.2d 789, 793 [1965]; *Arkansas Louisiana Gas Co. v. McBroom*, Okl.App., 526 P.2d 509, 510 [1974]. The January 12th order does *not* preclude us from reexamining our cognizance of this appeal. Nor is it too late to dismiss it now.

## II.

## ASSUMING THE APPEAL IS PROPERLY HERE, THE TRIAL COURT'S REFUSAL TO SUSPEND THE AGENCY DECISION PENDING JUDICIAL REVIEW, COUPLED WITH ORU'S COMPLETION OF THE HOSPITAL FACILITY, PLACES THIS APPEAL IN A POSTURE PRE–PACKAGED FOR ORU'S VICTORY BY A *FAIT ACCOMPLI*

The state/federal dual regulatory system[3] for "institutional health services" requires a license for much more than the actual operation of a new hospital or of an additional wing. It embraces both "offering or development"[4] of proposed objects. The phrase clearly includes *everything* from *public solicitation* of funds and *construction of facilities* to *rendition of services*.[5] Without a CON no hospital bond issue can be sold. Any unlicensed "offering or development" activity constitutes a misdemeanor.[6]

1. In *Bohms v. Gardner*, 381 F.2d 283, 285 [8th Cir. 1967] Justice Blackmun, then a circuit judge, aptly stated the federal rule: "Although the Secretary [of Health, Education and Welfare] made a final administrative decision for purposes of court review ... no such decision was made at the district court level. *And it is district court action which measures our appellate jurisdiction...* The district court merely vacated the Secretary's decision and remanded the case for reconsideration and, possibly, the reception of additional evidence. It neither granted nor denied the relief the claimant seeks. The adverse agency decision so vacated may of course be reinstated in due course but it may go the other way. Until the Secretary acts on the remand we have no insight as to what his eventual decision will be. Thus, in the words of *Catlin v. United States*, [324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 [1945]], supra, the litigation had not reached its end on the merits and there is more for the court to do than execute the judgment, or, as Judge Ridge said, in *Smith v. Sherman*, supra, p. 551 of 349 F.2d, the district court's action by no means was 'the last word of the law.'" [Emphasis added].

2. A decision in which three justices, including myself, did not concur.

3. The state act applicable to this case is that found in 63 O.S.Supp.1979 §§ 2651–2656.

4. 63 O.S.Supp.1979 § 2651. The National Health Planning and Resources Development Act of 1974 [PL 93–641 § 1523(a)(4)(A), 42 U.S.C. 300 m–2] provides that the state CON program shall include a review and determination of need "*prior to the time* such services, facilities, and organizations are *offered* or *developed* and substantial expenditures are undertaken in preparation for such offering or development". [Emphasis added]. The infinitive "to develop", when used in connection with health services, means "to undertake those activities which on their completion will result in the offer of a new institutional health service". 42 CFR 122.301.

5. See annotation on validity and construction of statute requiring establishment of "need" as precondition to operation of hospital or other facilities for the care of sick people in 61 ALR3d 278, 280. For origin and analysis of the state/federal regulatory scheme for institutional health services see: Chayet & Sonnereich, Certificate of Need: An Expanding Regulatory Concept [MIP Publication 1978] and Hyman, Health Regulation: Certificate of Need and 1122 [An Aspen Publication 1977].

6. 63 O.S.Supp.1979 § 2656.

When ORU completed the hospital construction, it did not stop short of performing a function licensed by its CON. It had moved far past the point of commencement and well into the main arena of a statutorily regulated activity even though the hospital had not yet opened its doors. In short, since OHPC's decision in its favor ORU has been in the process of carrying on functions authorized by its unstayed certificate [CON]—not just some activity preparatory to the licensed operations under it.

Assuming the appeal is properly here, my other concern—equally serious as that for our jurisdiction in the case—is for the posture in which it comes here. It is pre-packaged for but a single possible form of practical relief affordable—ORU's victory by a *fait accompli*. The situation results primarily from the trial court's refusal to stay, pending judicial review, the decision of the Oklahoma Health Planning Commission [OHPC] granting ORU its CON. Aided by an ample reservoir of available funds secured from private donations, and unfettered by the restraining hand of a judicial stay order, ORU proceeded to *develop* and *complete* the proposed hospital project.[7] The erection of that costly facility does now significantly impair the range of practical choices available to us in deciding this appeal. If the order appealed from remains unreversed—here and now—the trial court's eventual disposition of the case might condemn to idleness a valuable community resource—at least until another, equally lucrative and fitting, purpose may be found for it.[8] In the context of an administrative proceeding, the appellee, if victorious on appeal, could not secure a mandatory injunction to require ORU's dismantling of the hospital facility. Cf. *Moore v. White*, Okl., 323 P.2d 352, 355–356 [1958]. Absent most compelling reasons, the judiciary is loath injuriously to affect one's valuable investment made in reliance on a license.[9]

---

7. The state/federal regulatory scheme subjects to licensing requirements [CON] not only the construction of, but also public fund raising for, any new or additional *institutional health services*. Unfunded projects must await the issuance of a CON before a public promotion or solicitation campaign may begin. Only *funded* projects, i. e. those requiring no public promotion, can be ready to start construction at the very moment the CON is issued. A CON holder of a pre-funded project—such as ORU—has the *present capacity* immediately to enjoy the fruits of an agency's decision. *Goodin v. State ex rel. Okl. Welfare Commission*, 436 F.Supp. 583, 586 [W.D.Okl.1977]. A CON is clearly more than a license to operate a hospital. It is a permit for a substantial investment in a health facility and an eligibility status for participation in available government programs. So far as the record discloses, the ORU project, on review here, had all the needed resources—either at hand or firmly committed—when the CON was issued. This gave ORU a position far superior to that occupied by a *nonfunded* CON holder. When, as here, it is clearly shown that the CON holder has sufficient funds at his disposal to complete developing the proposed health facility during the pendency of judicial review, a stay appears *essential*, and must hence be regarded as absolutely *mandatory*, to assure fair, effectual and evenhanded application of judicial process in a district court appeal from an agency's decision granting a CON. The trial judge did not so view protestants' [appellees'] stay request. It was denied in the exercise of his discretion. That decision has not been presented for review here. See *Davis v. Secretary, Dept. of Health, Education & Welfare*, 386 F.2d 429 [4th Cir. 1967]. The second attempt to secure a stay occurred shortly after the district court, on December 1, 1978, reversed the OHPC's decision. The trial judge would not then act on the request, believing that the filing of this appeal operated to divest him of all cognizance in the case. His view was manifestly in error. Rule 1.13, Rules on Perfecting a Civil Appeal, 12 O.S.1971, Ch. 15, App. 2; *Mapco, Inc. v. Means*, Okl., 538 P.2d 593, 596 [1975]; *Tisdale v. Wheeler Bros. Grain Co., Inc.*, Okl., 599 P.2d 1104, 1106–1107 [1979]. Appellee, who shortly after the filing of this appeal had attempted to command, by mandamus from this court, the trial judge's exercise of his statutory stay powers, ceased pressing for the writ after this court's January 12, 1979 order denying the dismissal motion.

8. While it is true that ORU resisted a stay by announcing that it was willing to proceed with the construction "at its peril", we can have no assurance now that its position will remain unchanged when it becomes unable to operate the hospital under its hard-fought-for CON.

9. *Churchill Tabernacle v. Federal Communications Commission*, 160 F.2d 244, 247 [D.C.App. 1947]; *Evangelical Lutheran Synod v. Federal C. Com'n.*, 105 F.2d 793, 796 [D.C.App.1939].

So long as this presumably single-purpose building is allowed to remain standing and is unoccupied by some ORU department unrelated to health sciences, it will likely spur ORU's determined efforts to press upon the community its never-to-be withdrawn offer of hospital service to be rendered at the university's medical school. The problem has a distinctly recurrent dimensional sweep. Practical relief here is hence obviously restricted to but a single choice—the option followed by the court's opinion. I do not feel comfortable being placed in this decisional straitjacket. I would declare this controversy moot[10] because the court is impotent to grant any form of practical relief affordable other than handing ORU its victory by a *fait accompli*. Moreover, I feel that judicial process cannot be administered in the very framework in which it is constitutionally mandated—with detachment and neutrality—when a court is left without the complete and unimpeded freedom to choose from a full range of alternatives dictated by the rule of law rather than by the narrow demands of economic reality and convenience.

ORU's successful decision before the agency [OHPC] has now been carried into execution. It cannot be undone here. Public perception of the judiciary's dispute-settling role can hardly be enhanced when a court willingly turns itself into a government bureau to perform *no* function other than as registrar and herald of one's CON claim which is now *irreversibly perfected* and *judicially unalterable*.

I would dismiss the appeal. When the district court reaches this case for the second time, I am confident it will make a disposition that is proper under the facts which have transpired since the appeal was brought here.

**10.** When the court allows a licensee to enter upon a regulated activity following an investment of appreciable funds, the issue of his license eligibility may be regarded as mooted. The doctrine of mootness applies in judicial review of agency action. *In re Peoples*, 296 N.C. 109, 250 S.E.2d 890 [N.C.1978]; *National Ass'n of Securities Dealers v. SEC*, 143 F.2d 62, 63 [3rd Cir. 1944].