**LANDELL et al.**
v.
**NORTHERN PAC. RY. CO.**
Civ. A. No. 5514–50.

United States District Court,
District of Columbia.
June 23, 1954.

See also 98 F.Supp. 479.

Robert W. Lishman, Washington, D. C., for plaintiffs.

Bernard G. Ostmann, Washington, D. C., and Porter R. Chandler, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl), New York City, for defendant.

TAMM, District Judge.

The issues of this case reach back over a period of ninety years to the time when Congress sought the expansion of the West by encouraging settlers and railroads through the inducement of free land which, at that time, must have seemed limitless. In this pioneer setting, on July 2, 1864, Congress created a Federal corporation, the Northern Pacific Railroad Company (hereafter referred to as the Railroad.) [1] Financial difficulties eventually caused the appointment of receivers in 1893, and in 1896, pursuant to a reorganization plan and foreclosure proceedings under consent decrees in the Circuit Court of the United States for the Eastern District of Wisconsin, the Northern Pacific Railway Company (hereafter referred to as the Railway), a Wisconsin corporation, acquired the Railroad with its land grants and other properties, and has since operated the road and has obtained patents for millions of acres under the land grants. Successors in interest to non-assenting minority stockholders of the Federal corporation under the reorganization bring this suit against the Railway to set aside the decrees and orders of the Circuit Court of the United States for the Eastern District of Wisconsin, to declare title to the Railroad, franchises, and all other properties of the Railroad to be still in the Railroad, and to have the Railway account to the Railroad for all properties and profits received during the past half century. Plaintiffs' allegations are substantially that the defendant became the legal successor to the Railroad by a fraud upon the Wisconsin court, that defendant has maintained this position by the misuse of judicial process, that the Wisconsin court exceeded its authority in approving conditions in the consent decrees which were in violation of the statute creating the Federal corporation, and that the proceedings were also void in that the United States was not made a party thereto. Defendant Railway has moved for summary judgment on the grounds that the action is barred by the statute of limitations and by laches. Consideration of this motion requires a review of the events preceding the filing of the present action on December 20, 1950.

After refusing to join in the reorganization of 1896, the dissenting stockholders, by written agreement in 1898, formed a committee to protect their rights and interests. Over the years, counsel for the committee and its members have been actively protesting possession by the Railway at stockholders' meetings of the Railway, to the Department of the Interior, the Interstate Commerce Commission, Attorneys General, and have agitated for Congressional investigation.

On the legal side, three suits are of special interest in consideration of the present motion. The first of these was brought in 1900 in the United States District Court for the Southern District of New York by Joseph Hoover "on behalf of himself and of such other stockholders of the Northern Pacific Railroad Company as may intervene and become parties hereto." [2] The action was against the Railway and others involved in the 1896 reorganization and in substance attacked these proceedings on many of the same grounds alleged by the present plaintiffs. After numerous periods of inactivity, the Hoover case was dismissed for lack of prosecution and a motion to restore it to the calendar was denied for inexcusable laches by Judge

---

1. 13 Stat. 365.

2. Deposition of Plaintiff Robert W. Lishman. p. 22, Exhibit 9, p. 3.

Hulburt on March 15, 1939.[3] Neither the Committee of the minority stockholders nor any of its members individually at any time attempted to participate officially in this suit, although they followed the proceedings, and counsel for Hoover was also counsel for the committee. Subsequent to dismissal of the suit, it was learned that Hoover, instead of being a bona fide non-assenting shareholder, had actually participated in the reorganization, voting some of his stock in favor of the reorganization.

The second suit, United States v. Northern Pacific Railway Co., 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210, is also known as the Land Grant Case. In 1924, President Coolidge and the Secretaries of Agriculture and Interior asked Congress to investigate the land grants to the Northern Pacific Railway Company. After a five-year study, a joint committee of Congress recommended that the Attorney General be authorized to institute an action to obtain "a final and complete determination of the respective rights of the United States and the Northern Pacific Railway Company to the end that the grants shall be finally adjusted and the interests of the United States and the grantee shall be fully protected."[4] Congress approved the recommendation[5] and suit was begun by the Attorney General in 1930. The District Court referred the case to a Special Master who made one report in 1933 and another in 1937. After the second report in 1937, minority stockholders of the Railroad attempted to intervene. The motion was denied as coming too late in the progress of the litigation. Schmidt v. U. S., 9 Cir., 102 F.2d 589. Upon remand of U. S. v. Northern Pacific Railway Co., 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210 by the Supreme Court to the District Court for further proceedings, a second petition by the minority stockholders for leave to intervene was made and denied. 41 F.Supp. 273.

The third suit is the present one, the first suit initiated by the committee since its formation in 1898. From the briefs filed and the oral arguments for and against granting the motion for summary judgment, three questions are posed: (1) Does the statute of limitations apply as a bar to this action; (2) Is this the kind of situation to which the doctrine of laches can be applied; and if so, (3) Do the facts in this case warrant such application.

Since the Court, for the reasons set forth below, finds that the plaintiffs are barred by laches, it is not necessary to pass on defendant's contention that this suit falls within the concurrent jurisdiction of law and equity and therefore the statute of limitations must be applied.

■ Plaintiffs maintain that the doctrine of laches cannot apply to a case like the present one in which it is alleged that (1) an act done is in violation of a statute, and in which this violation still continues today; (2) in which a court acts beyond its powers; and (3) in which a decree is procured by a fraud upon the court. Plaintiffs make the plausible argument that a transaction which is fraudulent and illegal in its inception cannot be made legitimate and lawful by the passage of time. This is a basically sound argument. Does it not follow, however, that persons injured by an allegedly fraudulent transaction must exercise their legal rights within some reasonable period of time, at least within the lifetime of some party or witness to the original transaction? It is this Court's view that although time may not make legal that which is illegally conceived, time may bar the capacity of allegedly injured persons to complain of the transaction. Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 349, 64 S.Ct. 582, 88 L.Ed. 788.

■ The Court is asked to accept as an equitable proposition the idea that a suit is never barred where the above

---

3. Unreported Opinion. See Lishman deposition, Exhibit 123.

4. S.Rep.No.5, 71st Cong. 1st Sess.

5. Act June 25, 1929, 46 Stat. 41.

enumerated conditions exist. As Mr. Justice Story remarked: "It is for the public interest and policy to make an end to litigation, or, as was pointedly said by a great jurist, that suits may not be immortal, while men are mortal." Ocean Insurance Co. v. Fields, 18 Fed.Cas. pages 532, 539, No. 10,406, 2 Story, 59. Present plaintiffs are asking the aid of equity against an alleged wrongdoer but deny that the principles of equity may be evoked as against themselves. It has long been settled that the public interest, intervening equities of third parties and the rule of "clean hands" may all operate to raise the bar of laches. Vigilantibus non dormientibus aequitas subvenit. "If the complainants may put forward these excuses for delay after 30 years, there is no reason why they may not allege the same as an excuse after the lapse of 60. The truth is, there must be some limit of time within which these excuses shall be available, or titles might forever be insecure. The interests of public order and tranquillity demand that parties shall acquaint themselves with their rights within a reasonable time, and, although this time may be extended by their actual ignorance, or want of means, it is by no means illimitable." Wetzel v. Minnesota Railway Transfer Co., 169 U.S. 237, 241, 18 S.Ct. 307, 309, 42 L.Ed. 730.

On the final point, whether laches applies under the facts of this case, the Court finds against the plaintiffs for the following reasons:

■■ Plaintiffs assert that there has been no lack of diligence since for more than fifty years they have continuously sought administrative and legislative relief. In other words, they raise the novel point that an injured party can avoid laches by seeking remedies other than legal: Under limitations, a plaintiff may safely resort to peaceful settlement of his claims, Shaffer v. Rector Well Equipment Co., 5 Cir., 155 F.2d 344, or pursue an administrative remedy provided for by statute, Order of Railroad Telegraphers v. Railway Express Agency, supra. But this right is not perpetual. If it is in the public interest that there be an end to litigation, certainly it cannot be held that diligence can be handed down successfully from one generation to another. This is literally true in the present case since not one of the original dissenting stockholders is alive today, nor are any of the original parties who participated in the reorganization of 1896, nor even any of the original counsel for the Railway or the protective committee.[6] It thus appears that no party, attorney or witness to the 1896 proceedings is alive today to affirm or deny these ancient charges. As the Court said in Abraham v. Ordway, 158 U.S. 416, 421, 15 S.Ct. 894, 896, 39 L.Ed. 1036: " 'Length of time necessarily obscures all human evidence, and deprives parties of the means of ascertaining the nature of original transactions; it operates by way of presumption in favor of the party in possession. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor'."

■ No matter how plaintiffs sought relief in the past, what they sought then and seek now is a declaration of their legal rights, and ultimately legal rights must be determined in a judicial proceeding. Even "the mere institution of a suit does not, of itself, relieve a person from the charge of laches, and that if he fail in the diligent prosecution of the action the consequences are the same as though no action had been begun." Johnston v. Standard Mining Co., 148 U. S. 360, 370, 13 S.Ct. 585, 589, 37 L.Ed. 480. "[T]he mere assertion of a claim, unaccompanied by any act to give effect

---

6. Unreported opinion of Judge Hulburt in the Hoover case, supra; affidavit of Hugh McLeod, Assistant Secretary of Northern Pacific Railway Co. and affidavit of R. Gordon Wasson, Vice President of J. P. Morgan & Co., Inc., exhibits A and B respectively of defendant's motion for summary judgment.

to it, cannot avail to keep alive a right which would otherwise be precluded." Mackall v. Casilear, 137 U.S. 556, 567, 11 S.Ct. 178, 182, 34 L.Ed. 776.

█ The fact is that plaintiffs deliberately and under the advice of competent counsel [7] chose their course for over fifty years. The written agreement of 1897 creating the protective committee authorized the committee "to institute and conduct all such proceedings at law or in equity" necessary to protect and assert the rights of the minority stockholders.[8] Represented by able counsel, these stockholders and their heirs have attempted unsuccessfully for over half a century to persuade others to fight the legal battle, and finally, under circumstances not shown to differ materially from the situation through the years, they have decided to ask for a legal determination of their legal rights by a legal tribunal.

It would seem that long ago plaintiffs should have been cautioned by the unproductive results of their protests to the non-judicial branches of the government. In 1897, during the term of President Cleveland, counsel for the committee appealed to the Secretary of the Interior, and the matter was referred to the Attorney General who held the claims were unfounded. 21 Opinions of the Attorney General 486. In 1904, during the administration of President Theodore Roosevelt, another appeal was made to the Secretary of the Interior. It was again referred to the Attorney General and again was rejected by him. 25 Opinions of the Attorney General 401. Thus, twice, executive officers with the responsibility of guarding the public interest put plaintiffs on notice that no support would be forthcoming from that branch of the government.

The committee fared no better in its attempts to institute Congressional investigation, although plaintiffs allege that they were responsible for the United States bringing suit in the Land Grant case. Even if we assume the truth of this allegation, plaintiffs are faced with the finding of laches in their attempts to intervene in that suit. As the Court states in its opinion, Schmidt v. U. S., supra, 102 F.2d at pages 595–596:

"The appellants account for their delay in presenting their petition for leave to intervene on the ground that they assumed that all the issues stated in the act of June 25, 1929, would be presented and tried in the case, but that when they ascertained that all these issues had not been passed upon and the court was moving toward a final decree without such determination of all these issues, they sought to intervene. This contention is inconsistent with the claim that the minority stockholders of the Railroad Company had been exercising the greatest possible diligence since 1875, and particularly since 1896, to establish their rights and that the act of June 25, 1929, resulted from their persistence * * *. Having, as they claim, so far succeeded in their efforts they then remained dormant for nearly seven years after the Attorney General had filed a complaint in this action in which it was alleged that the Railway Company was the successor in interest to the Railroad Company which allegation was admitted by both companies. The admission by the Railroad Company was made more than five years before the appellants attempted to intervene."

---

7. Counsel for the committee included Joseph P. McCullen, member of the bar of Philadelphia and later judge of one of the municipal courts of Philadelphia; and John G. Johnson, outstanding member of the Philadelphia bar.

8. Lishman deposition, p. 8, exhibit 1. See also to the same effect the revised agreement of 1906, Schedule A of the complaint.

Nor can plaintiffs assert that the defendant has ever indicated anything but opposition to their claims. This opposition was noticed as far back as 1902 by a resolution passed at the annual meeting of the majority stockholders.[9] This opposition has continued unabated through the years as indicated by repeated actions at annual stockholders' meetings. The Railway's answer in the Hoover suit was again notice to plaintiffs that the defendant denied these alleged rights and would resist them in court. Railway's unwavering opposition was a plain indication that it would not yield to anything less than adverse court action. Norris v. Haggin, 136 U.S. 386, 10 S.Ct. 942, 34 L.Ed. 424.

■ The fact, as plaintiffs aver, that their counsel advised administrative and legislative instead of judicial action is a fact which militates against them. Faulty judgment of counsel is certainly no defense against the charge of laches. Nor is the argument that these non-legal methods were far less costly than court action. "His [plaintiff's] poverty or pecuniary embarrassment was not sufficient excuse for postponing the assertion of his rights." Hayward v. Eliot National Bank, 96 U.S. 611, 618, 24 L.Ed. 855. See also Leggett v. Standard Oil Co., 149 U.S. 287, 13 S.Ct. 902, 37 L.Ed. 737; Levis v. Kengla, 8 App.D.C. 230; 19 Am.Jur. sec. 503.

Another argument advanced is that the defendant has prevented full knowledge and disclosure of the fraud by refusing to make its records available to the minority stockholders. However, plaintiffs have made no convincing showing that the alleged fraud lies more fully exposed today than it was in 1896, or at the latest, in 1900, when the Hoover suit was filed. Certainly the processes of court were available to compel access to defendant's records, and all the other records were matters of public record. Contrarily, plaintiffs assert that nothing more is necessary to prove their claims than the records now before the Court. If this is true, then from the public records and from the defendant's own records, accessible through court process, plaintiffs could long ago have revealed the alleged fraud in its entirety. If more was necessary, then of necessity plaintiffs' proof must include the testimony of witnesses no longer alive. "[T]o avoid the lapse of time or statute of limitation, the fraud must have been one which was concealed from the plaintiff by the defendant, or which was of such a character as necessarily implied concealment. Neither of these principles can apply to the defendants in this case. The acts which constituted the fraud as alleged in the bill were open and public acts. The note and the mortgage were recorded in the proper public office of the proper county. The possession of defendants was obtained by judicial proceedings which were open to everybody's examination, and which were probably well known in the entire community." Norris v. Haggin, supra, 136 U.S. at page 392, 10 S.Ct. at page 945.

On the issue of fraud, plaintiffs are also confronted with a statement made by their late counsel in a letter of March 29, 1916:

"That a great wrong has been done them [minority stockholders] has always been believed in, but discovery of the breach of trust and of the perfidy of the fraud perpetrated against them was not had until now, the facts having been most skillfully concealed from gov-

---

9. Lishman deposition, exhibit 26: "Resolved: That the stockholders of the Northern Pacific Railroad Company expressly dissent from any action pretending to be taken in the name of or on behalf of the stockholders of this Company in anywise bringing in question in Congress or in any State of the United States the validity and completeness of such foreclosure proceedings or the title of the Northern Pacific Company to its railroad land grant and property formerly of this Company, and declares any statements or action questioning the same as unwarranted and unfounded in law and in fact."

ernment officials, from the Court and from the public."[10]

It is difficult to understand plaintiffs' excuse that their delay was in part due to the problem they faced of persuading a court to set aside the decrees of 1896 which the defendant fraudulently fortified with the erroneous opinions of the two Attorneys General and judicial dicta. Plaintiffs' problem is no different today except that the array against them is much greater. Plaintiffs themselves were responsible for the opinions of the Attorneys General, and much of the other matter complained of resulted from their refusal to submit their claims to the courts. Their confidence in the courts comes only after fifty-four unsuccessful years elsewhere. This Court finds no substantial grounds for such neglect.

■ Before the Court also are the vast changes in the financial and physical structures of the Railway over the past fifty-four years. Its mileage has increased nearly 50%; property values have increased from approximately $300,000,000 to about $820,000,000; lines and equipment of other railroads have been acquired; stock and bond issues have been sold to the public on numerous occasions.[11] Granting the relief prayed for by the plaintiffs would create a concentric chaos affecting the rights and equities of thousands of stockholders and creditors, most of which were not even in existence at the time of the alleged fraud.[12] Where a plaintiff has been acquiescent while defendant has made great changes and expenditures of money, courts of equity have always refused to give relief. Hays v. Port of Seattle, 251 U.S. 233, 40 S.Ct. 125, 64 L.Ed. 243; Patterson v. Hewitt, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214.

Plaintiffs' counsel have presented a variety of additional arguments in opposition to the defendant's motion for summary judgment, supported by many citations which these counsel contend uphold their position. The Court has carefully considered the points thus raised and the cases cited. In the interest of brevity, the Court refrains from detailed discussion of these points, observing that it can find no ultimate support of plaintiffs' position due primarily and basically to substantial differences of facts between the present case and the cited cases.

Despite plaintiffs' strong appeal to equity, in consideration of the defendant's greatly changed position and the equities of innocent intervening parties, this Court must find that the alleged rights of the minority stockholders are buried in the grave created by their inexcusable lack of diligence in not sooner asserting these claims in the courts. Defendant's motion for summary judgment is granted.

The Court commends counsel on both sides for their able presentations and careful research which were of great help to the Court. Prevailing counsel will present the necessary order granting the motion for summary judgment.

10. Letter from Joseph P. McCullen, counsel for the committee, to Francis Lynde Stetson, attorney for the defendant Railway. Lishman deposition, p. 180, exhibit 100.

11. Affidavit of John J. Leahy, statistician of Northern Pacific Railway Co., exhibit C of defendant's motion for summary judgment.

12. The affidavit of Hugh McLeod, supra, Assistant Secretary of defendant, states the following comparison of common stockholders in the years 1896 and 1951: in 1896 there were 2800 stockholders holding 800,000 shares of common stock, while in 1951 there were 20,914 stockholders: Of the 20,914 stockholders in 1951, only two individuals and 31 firms were also stockholders in 1896. The two individuals held 7 shares in 1896 and 9 shares in 1951; the 31 firms held 34,638 shares in 1896 and 86,066 shares in 1951. These 31 firms are brokers and security dealers and are and have been at all times engaged in buying and selling securities for customers.