**Charles H. ADAIR and June P. Adair, Plaintiffs,**

v.

**NASHVILLE HOUSING AUTHORITY et al., Defendants.**

**R. L. GARDNER and Ruth Gardner, Plaintiffs,**

v.

**NASHVILLE HOUSING AUTHORITY et al., Defendants.**

**Civ. A. Nos. 5686 and 6021.**

United States District Court, M. D. Tennessee, Nashville Division.

March 5, 1974.

J. Granville Clark, Russellville, Ky., for plaintiffs.

Joseph L. Lackey, Jr., Nashville, Tenn., for N.H.A.

Wilson Sims, Nashville, Tenn., for Vanderbilt.

Charles H. Anderson, U. S. Atty., Nashville, Tenn., for HUD.

## OPINION

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This suit was originally brought on the 26th day of March, 1970, by property owners in the University Center Urban Renewal Project area (hereinafter referred to as "Tennessee R–51") located in Nashville, Tennessee. The present defendants are the Nashville Housing Authority (hereinafter referred to as "NHA"), Jack Herrington, Secretary and Executive Director of NHA, The Vanderbilt University and the Secretary of the United States Department of Housing and Urban Renewal (HUD). The suit was not brought as a class action.

The cases were tried together before District Judge L. Clure Morton, who, on September 30, 1971, issued a memorandum opinion and order containing findings of fact and conclusions of law on all issues favorable to the defendants. Then, however, Judge Morton dismissed the cases for want of a federal question because HUD was not then a party defendant.

On appeal, the United States Circuit Court of Appeals for the Sixth Circuit (468 F.2d 480) agreed with Judge Morton's rationale but remanded the cases to give the plaintiffs an opportunity to join HUD as a party defendant. This was done. Judge Morton then recused himself and the Honorable Daniel H. Thomas, Senior District Judge for the Southern District of Alabama, was designated to hear the cases. In the remanded case the parties have stipulated that the entire record in this cause, including the testimony at the previous hearing, may be considered by the

Court. It was further stipulated that the testimony of a HUD witness could be introduced in behalf of HUD and that plaintiffs would have the opportunity to rebut the HUD testimony. All additional testimony was submitted to this Court upon evidentiary depositions, and the entire record in this cause has been considered by this Court in rendering this Opinion.

The Urban Renewal Project Tennessee R–51 was conceived and implemented under the Federal Urban Renewal Act known as Section 112, which is codified in 42 U.S.C. § 1463. This statute provides that where an area surrounding an educational or hospital facility is a slum or is blighted and such area has been declared by the local government to be an urban renewal project, that such project, if it meets certain Federal standards, will then qualify for Federal funding.

The attacks made upon Project Tennessee R–51 by the plaintiffs are set forth in a stipulation of issues which was incorporated as follows:

"1. Whether the defendant, The Nashville Housing Authority, and the individual defendant Gimre (Defendant Herrington's predecessor) in his capacity as the Secretary and Executive Director of the Nashville Housing Authority committed a clear and obvious abuse of power in the exercise of their duties under Section 1460, Title 42, USCA, in relation to the adoption of the University Center Urban Renewal Project by Metropolitan Government of Nashville and Davidson County, and what is the scope of review by this Court of the actions of the said defendants in relation to the adoption of said project and the effect of any such abuse on the validity of the project.

2. Whether the defendant, The Vanderbilt University, as part of a conspiracy with defendant Nashville Housing Authority and with Metropolitan Government, deliberately permitted property owned by Vanderbilt in the Project area, which met the standards under the housing codes to deteriorate to substandard housing in order to qualify the area as a blighted or substandard area; and if so, the effect of such conspiracy on the validity of the Project.

3. Whether officials of the defendant, The Vanderbilt University, and the defendant, The Nashville Housing Authority, participated in a conflict of interest in violation of Section 13–910 TCA, which renders void the Project.

4. Whether plaintiffs, Adair and Gardner, in the process of qualifying the Project, were denied hearings before the Nashville Housing Authority, and whether such hearings are required under Section 10 of the Federal Administrative Procedures Act.

5. Whether Section 1463 of Title 42 of the U.S. Code is constitutional as violative of the due process clause of the Fourteenth Amendment of the Constitution of the United States in its application to the right of the defendant the Nashville Housing Authority, to condemn the property of the plaintiffs for the Urban Renewal Project.

6. Whether the plaintiffs, Adair and Gardner, have standing to raise and try the above issues in this Court."

The relief originally sought by the Plaintiffs was as follows:

(1) to enjoin the defendants from initiating eminent domain proceedings for the purpose of acquiring plaintiffs' property and to recover damages for the amount of dimunition in value of plaintiffs' property;

(2) to be entitled to a declaratory judgment of their respective rights pursuant to Rule 57 of the Federal Rules of Civil Procedure, and an adjudication that 42 U.S.C. § 1463 is unconstitutional.

Additional issues raised on the remand to this Court were: (1) whether there were arbitrary or capricious actions by HUD officials in the implementation of HUD responsibilities in regard to the project; and (2) whether since

the plaintiffs did not bring this suit until the project was well on its way toward completion (the initial inclusion of the plaintiffs' property in an urban renewal area having been declared by the Nashville City Council in 1961) the actions are barred by laches.

The background and history of the Project Tennessee R–51 were set forth in detail in the opinion by Judge Morton. This Court adopts that part of Judge Morton's opinion and will not repeat the background and history in this opinion.

Although the scope of review by this Court of the actions of the Nashville Metropolitan Council [1] and the actions of the HUD officials is narrow and limited, as hereinafter discussed, the nature of this case demands a complete review of the entire record, and therefore I have gone beyond this narrow and limited scope of review, and have made factual findings based upon the weight of the evidence.

Before setting forth findings of fact and conclusions of law, it is necessary that the Court state the nature of an urban renewal project involved. The type project under consideration here is a creature of the State and local government. The local legislative body (in this case the Nashville Metropolitan Council) must first designate and establish the urban renewal area in accordance with the statutes of the State of Tennessee. Then under applicable Federal statutes, the Secretary of the Department of Housing and Urban Development and his subordinates must determine whether the particular project qualifies for Federal participation in its funding. Two-thirds of the area covered by the Project was a "rehabilitation area" (wherein all structures, houses and other improvements were required to be

brought up to "standards" by their owners) and the remaining one-third of the area adjacent to the Vanderbilt campus was designated a "clearance area" (wherein all of the land was to be acquired by Vanderbilt, all structures removed and the entire area redeveloped by the University). The qualification requirements of the two segments of the Project are different as hereinafter explained.

The findings of fact and conclusions of law by the Court under the issues before it are:

### FINDINGS OF FACT

*Whether the project, Tennessee R–51, is in fact a slum, blighted and/or deteriorated area within the meaning of the Federal and State urban renewal laws and regulations?* [2]

1. There is a strong preponderance of evidence supporting the determination that the area within the Project is a slum and blighted area so as to qualify for urban renewal treatment within the definitions set forth in T.C.A. § 13–801 et seq. Particularly, the area meets the definition of a slum and blighted area as set forth in Section 13–813 T.C.A.; and therefore the actions of the Nashville Metropolitan Council in constituting the area an urban renewal project were lawful and in accordance with the statutes of the State of Tennessee.

2. A strong preponderance of evidence supports the determination that the Project area also qualifies for Federal funding as "an urban renewal area" in that it meets the requirements of the Housing Act of 1949, as amended, 42 U.S.C. § 1463. [3] The area also meets the requirements of the HUD Urban Renewal Manual in that at least twenty percent of the buildings in the area contain

1. Nashville changed its form of government in 1963 to The Metropolitan Government of Nashville and Davidson County.

2. Some of the issues have been modified and consolidated to conform to the issues on which the case was actually tried.

3. The definition of a slum or blighted area for Federal funding purposes is set forth in 42 U.S.C. § 1460(a) as follows:
   " 'Urban renewal area' means a slum area or a blighted, deteriorated, or deteriorating area in the locality involved which the Secretary approved as appropriate for an urban renewal project."

one or more building deficiencies and the area itself contains at least two environmental deficiences. The environmental deficiencies existent in the area are: (1) inadequate street layout; (b) incompatible uses or land use relationships; (c) over-crowding of buildings on the land and (d) excessive dwelling unit densities and (e) inadequate and antiquated sewer and other utilities in the area.

3. The area adjacent to the Vanderbilt University qualifies for funding for clearance treatment under the provisions of the Housing Act and under the requirements of the HUD Urban Renewal Manual. In the clearance area there are at least twenty percent of the buildings in structural condition that warrant clearance. There are an additional number of buildings in the clearance area to total at least fifty percent of the total buildings, which because of their blighting influence also warrant clearance.

4. When the Metropolitan Council on August 15, 1967, adopted its Ordinance 67–278, declaring the total area an urban renewal project, there were 39.8 percent of buildings in the area with deficiencies, or approximately twice the number required under the HUD Manual for qualifying the Project area for Federal funding.

5. In the clearance area, there were in the summer of 1967, 54.5 percent of the buildings warranting clearance either as a consequence of being structurally sub-standard (28.4%) or containing blighting influences (26.1%), thereby qualifying that area for clearance treatment within the meaning of the Urban Renewal Manual.

6. The clear preponderance of evidence supporting the qualification of the areas for urban renewal and clearance treatment under Tennessee statutes, the Housing Act of 1949 and the various provisions of the HUD Manual is from testimony of well qualified engineers, both independent and members of the staff of NHA and HUD. The evidence introduced on behalf of the plaintiffs, though completely sincere, is for the most part by persons without engineering qualifications. The officials of NHA and HUD made a thorough and repeated study as to the qualification of the area. At several junctures during the history of this Project when complaints were made by the plaintiffs or other property owners, the subject matter of their complaints were carefully considered and, as it appears to the Court, were handled in a competent and courteous manner.

7. Although to sustain the project the Court need only find that the actions of the Nashville Metropolitan Council and HUD in forming and funding the project were not arbitrary, capricious or a palpable abuse of discretion, the Court finds, in fact, that the project area, and the clearance area therein, constituted lawful urban renewal areas under both State and Federal requirements.

*Whether the actions of the officials of NHA and HUD and the action of the Metropolitan Council were so baseless, lacking in accuracy and fact or the officials so lacking in knowledge, that the decisions of these officials were arbitrary, capricious and in bad faith?*

8. The Court's findings in regard to this charge are incorporated in Findings 1 through 8, but it should be added here that because of the protests of the plaintiffs and others not only did the HUD officials review the findings of NHA and the Metropolitan Council to determine their reasonableness, but also the HUD staff taking special interest in the project, examined the area independently, and made an independent determination that the area qualifies for Federal funding and, also, that the clearance area met the requirements of the HUD. manual.

9. The Court therefore finds that the decisions of the officials of HUD, NHA and The Metropolitan Council were not arbitrary, capricious or in bad faith, but, on the contrary, these decisions were in accordance with the applicable legal requirements and the clear preponderance of evidence.

*Whether the plaintiffs Adair and Gardner were denied opportunities to inspect the project area plans, surveys, records, etc. with the result that they were denied "hearings" before the Housing Authority and such other hearings as might be required by the Statutes of Tennessee and Federal Housing Act?*

10. Tennessee law (T.C.A. Section 13–815) requires a public hearing prior to approval of an urban renewal project by the local government. The Housing Act of 1949, 42 U.S.C. § 1455, requires that if an urban renewal project is to be Federally funded a public hearing must be held before land is acquired.

11. The record is without dispute that the plaintiffs and other property owners attended a public hearing sponsored by the Nashville Housing Authority within the project area on November 4, 1965. Again on July 19, 1967, at the time the final plans for the project were formulated, another public hearing was held in the Project area which was attended by the plaintiffs and other property owners. Then on August 7, 1967, the Nashville Metropolitan Council held a public hearing in the Municipal Auditorium of Nashville which was attended by between 350 and 500 people. At all of the public hearings the project was explained by officials of the Nashville Housing Authority, and the advisability of the project was discussed and debated. At the public hearing before the Metropolitan Council, practically all of the challenges to the project raised in this suit were argued before the Council by the plaintiffs and by one of the District Councilmen, after which on August 15, 1967, the Council voted 30 to 4 in favor of Ordinance 67–278 approving the project.

12. Prior to these public hearings reasonable notice was given, the hearings were well attended and residents who had questions or protests were heard.

13. A project site office was opened within the project area in 1965. Maps and plans were kept in this office and were open for public inspection. The record discloses that the plaintiffs Adair and other property owners frequently visited this office and were given such information as was available. Detailed computations concerning the rating given the different structures in the area were available prior to the adoption of the Ordinance by the Metropolitan Council and in fact the validity of such ratings was questioned and debated before the Council on much the same charges of irregularity as are made here. In addition, the plaintiffs Adair and other property owners were granted requests to appear before the Board of Commissioners of NHA to register their protests prior to NHA's recommendations being forwarded to the Nashville Metropolitan Council. Then after the adoption of the project by the Nashville Metropolitan Council the plaintiffs Adair were given a hearing by HUD officials prior to Hud's agreeing to fund the project. The evidence indicated that these were "fair and meaningful hearings".

14. The Court finds that the plaintiffs were not denied access to the project area plans, surveys, records and ratings on the structures involved. The public hearings held, and particularly the hearing of August 7, 1967, before the Metropolitan Council complied with Title 42 U.S.C. § 1455(d) and T.C.A. § 13–815.

*Whether a conspiracy existed between or among the defendants Vanderbilt University and Nashville Housing Authority and Nashville Metropolitan Government under which the conspirators determined to take the plaintiffs' property in violation of their individual rights, due process of law, equal protection of law and in order to qualify the area as a blighted area?*

15. The charges of conspiracy by the plaintiffs are that Vanderbilt purchased property in the area and allowed it to deteriorate in order to qualify the area as a blighted area; that the Housing Authority retained an engineering firm to survey the project area, which had

also been employed to assist the University in its campus planning and the general charge that the University originally conceived the idea of the urban renewal project and unlawfully influenced the local government to adopt the project for the private benefit of the University. There is no evidence of any such conspiracy among officials of Vanderbilt University, the Nashville Housing Authority and Metropolitan Government of Nashville.

16. There is no evidence that Vanderbilt accumulated property in the project area and allowed it to deteriorate in order to cause the area to qualify. On the contrary, the evidence demonstrates a consistent pattern by the University of demolishing houses which were not suitable for continued occupancy. Between 1962 and 1967, the University demolished 98 structures out of a total of approximately 250 structures which the University owned. When the question of continued demolition arose in 1965 HUD officials advised Vanderbilt to continue its demolition program as the area would continue to qualify even if these University owned houses were removed.

17. The engineering firm of Clark and Rapuano was retained by Vanderbilt in the late 1950's to assist the University in formulating its master plan for future expansion. In 1961 NHA retained the same firm to conduct inspection surveys and gather information for the determination of whether the proposed project met urban renewal requirements. There is no evidence that the engineering firm exhibited a bias in favor of the desires of the University nor that the firm deliberately carried out its inspection surveys with a purpose of achieving the requisite qualifying percentages.

18. In answer to the charge that the urban renewal project was conceived and implemented for the sole private benefit of Vanderbilt, the evidence shows that the University began its own plan to acquire property in the clearance area in 1956 and at the time the land was approved by the Nashville Metropolitan Council, the University already owned more than one-half of the tracts of land in the clearance area. Judge Morton succinctly described the original purpose of the project as follows:

"At its inception, the University Center Urban Renewal Project included the Hillsboro Village shopping area, the Music Row area and the university and hospital complexes. When the plan was approved by the Nashville City Council in August, 1961, it was foreseen as a project which would be of benefit to the entire Nashville community. Vanderbilt was to benefit, as were the other universities in the area and the music industry and economic interests which were located in the area. The project was to provide a vehicle for orderly expansion, reduce traffic problems, and provide minimal costs for improving utilities and sewers in the area."

*Whether officials of the defendant, The Vanderbilt University, and the defendant, The Nashville Housing Authority, participated in a conflict of interest in violation of Section 13–910 TCA, which renders void the Project?*

19. There is no evidence to sustain the contention of the plaintiffs that the project is voided because of a conflict of interests in violation of Section 13–910 T.C.A. Without question, officers of two of the major banks in Nashville were also trustees of Vanderbilt University. Other officers of these banks were, during part of the approximately ten year span over which this project was developed, members of the Board of Commissioners of the Nashville Housing Authority. The Chancellor of Vanderbilt University was for a period of this time, a member of the Regional Federal Reserve Board. There is not the slightest bit of evidence that any of these individuals were, in their public capacities, at any time motivated by any purpose other than serving the interests of the community. The Court reiterates

the excerpt from Judge Morton's opinion as follows:

"This Court does not believe that members of the banking community must withdraw themselves from community involvement in order to avoid being burdened with individual responsibilities which arise from participation in community activities rather than from their employment responsibilities. The evidence did not disclose anything which would be suspect of or tainted with self-interest on the part of any of these individuals or institutions. Instead, there was substantial evidence of a dedication to public purpose and public responsibility on the part of each person individually, and each institution spearately involved. As to the individuals, the evidence affirmed the importance and the standard of quality of their individual efforts which they contributed to the betterment of the Nashville Community."

20. There is no evidence that either of these Commissioners had a "personal pecuniary interest" involved in their decision-making position as Commissioners of the Nashville Housing Authority.

## CONCLUSIONS OF LAW

■ 1. In 1959, Congress passed an amendment to the Federal Urban Renewal Act known as Section 112 which is codified in 42 U.S.C. § 1463. The specific purpose of this statute was to provide Federal funding for qualified urban renewal projects in the neighborhood of universities and hospitals. It appears to the Court that Project Tennessee R–51 is of the particular sort for which this statute was enacted.

■ 2. Section 112 of the Housing Act of 1949, 42 U.S.C. § 1463, meets the constitutional challenge. The fact that Vanderbilt University shares the benefits of the project with the Nashville community, and participates in the implementation of the project, does not render the project invalid.

"Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. See Luxton v. North River Bridge Co. (U.S.) supra [153 U.S. 525, 14 S.Ct. 891, 38 L.Ed. 808] cf. Highland v. Russell Car [& Snow Plow] Co., 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688. The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." Berman v. Parker, 348 U.S. 26, at 33–34, 75 S.Ct. 98, 103, 99 L.Ed. 27.

■ 3. The constitutionality of 42 U.S.C. § 1463 had been passed upon directly in Ellis v. The City of Grand Rapids, 257 F.Supp. 564 (W.D.Mich.1966) where the Court dealt with an urban renewal project in the vicinity of a hospital and sustained the constitutionality of the statute even though the hospital participated as a redeveloper of the project area. This Court, agreeing with Judge Morton and agreeing with *Ellis*, again sustains the constitutionality of 42 U.S. C. § 1463.

■ 4. The question of what constitutes a slum or blighted area is a legislative question, political in nature and involving questions of public policy. Berman v. Parker, supra; In Rem Bunker Hill Urban Renewal Project, 61 Cal.2d 21, 37 Cal.Rptr. 74, 389 P.2d 538 (1964); Berggran v. Moore, 61 Cal.2d 347, 38 Cal.Rptr. 722, 392 P.2d 522 (1964); Apostle v. City of Seattle, 70 Wash.2d 59, 422 P.2d 289 (1966); Harper v. Trenton Housing Authority, 38 Tenn.App. 396, 274 S.W.2d 635, 645 (1954); Harrison-Halsted Community Group, Inc. v. Housing and Home Finance Agency, 310 F.2d 99, 105 (7th

Cir. 1962); 40 Am.Jur.2d Housing Laws, § 19, pp. 1075–76.

5. The role of the judiciary in reviewing a legislative determination that a particular area is a slum or blighted area suitable for urban renewal treatment is narrow. The Court will not substitute its judgment for the judgment of the legislative body unless there is a showing that such determination was arbitrary and capricious constituting a clear and palpable abuse of its legislative responsibilities. In this case all presumptions are in favor of the validity of the exercise of the judgment of the municipal council. Berman v. Parker, supra; Runnels v. Staunton Redevelopment and Housing Authority, 207 Va. 407, 149 S.E.2d 882 (1966); Harper v. Trenton Housing Authority, supra; Apostle v. City of Seattle, supra; Starr v. The Nashville Housing Authority, 145 F.Supp. 498 (M.D.Tenn.1956).

6. The judicial review of federal agency action is limited to much the same scope of review as legislative action. Thus the Administrative Procedures Act Title 5 U.S.C. § 706, provides that the reviewing Court may only hold the action of a federal agency unlawful if such action is deemed arbitrary, capricious or abusive of discretion or otherwise not in accordance with law. In this case the Court finds that the actions of HUD officials in regard to the Project Tennessee R–51 were not arbitrary or capricious or an abuse of discretion, but were in accordance with the legal requirements for the establishment of an urban renewal project and were in accordance with the facts existent at the time of such actions.

7. In the present case, not only do the facts not justify judicial intervention, but on the contrary, clearly confirm the legislative determination by the Municipal Council of Nashville and the agency action by HUD officials that the area within Project Tennessee R–51, needed and deserved urban renewal treatment within the definitions set forth in applicable statutes and regulations.

8. While undoubtedly there existed within the urban renewal area some houses that were habitable and serviceable, and indeed beautiful and attractive, Congress and the Legislature of Tennessee have authorized an attack on the problem of blighted areas in a community on an area basis rather than on a structure-by-structure basis. As this Court stated in Starr v. Nashville Housing Authority, supra, citing Berman v. Parker:

"A redevelopment agency must approach the problem of the blighted parts of the community on an area, rather than on a structure by structure basis, and it is immaterial that some particular structure within such area may be safe, sound, and well-kept."

9. At common law in order to establish an unlawful conflict of interest it is necessary that the public official have conflicting "pecuniary" interests, 63 C.J.S. Municipal Corporations, Section 988. This project became legally operative when approved by the Metropolitan Council and funded by the HUD officials. While there is no conflict of interest shown on the part of the Commissioners of the Nashville Housing Authority, there is none alleged against the parties who gave life to the project.

10. Under the charge of conspiracy, plaintiffs have made the bare assertion that the University allowed its property in the clearance area to deteriorate in order to qualify that area. While the clear preponderance of evidence contradicts the plaintiffs' assertion there is no obligation on the part of a redeveloper to maintain its properties in an urban renewal area in a better state than the properties of other owners. Kimberline v. The Planning Board of Camden, 73 N.J.Super. 80, 178 A.2d 678, at 681 and 684:

"The allegation of plaintiffs that Rutgers contrived to bring this area to the blighted state was unsupported by evidence. The use of many of these residential properties which were purchased by Rutgers for purposes other

than residential is not proof of plaintiffs' contention. And furthermore, the fact that the present owners, Rutgers, or other perons, have not seen fit to continually restore these properties does not affect the determination, nor is it proof of any design on the part of either Rutgers, or such persons, to contribute to the blight. Rutgers has used these properties for the best use to meet their needs. It would not be economically feasible for it to act otherwise. . . . the fact that a redeveloper was available prior to the municipal determination and has now entered into an agreement with the housing authority can lead only to the conclusion that such is the exercise of sound judgment. There is no evidence of any wrongful conduct on the part of Rutgers, or its representatives." Kimberline, 73 N.J.Super. 80, 178 A.2d 678, at 681 and 684.

11. Defendants HUD and Vanderbilt, citing Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1960) and Landell v. Northern Pacific R. R. Company, 122 F.Supp. 253 (D.C. D.C.1954), affirmed 96 U.S.App.D.C. 24, 223 F.2d 316, Cert. den. 350 U.S. 905, 76 S.Ct. 178, 100 L.Ed. 795, have made the affirmative defense of laches in that for approximately nine years plaintiffs did not bring suit after they admittedly had notice of the 1961 action of the Nashville City Council declaring the area a slum and blighted area, and during this time HUD and Vanderbilt each spent approximately ten million dollars in the development and implementation of the project. While elements of this affirmative defense are present, it is unnecessary for the Court to reach a conclusion on this question in view of its other conclusions.

12. The issue of standing of the plaintiffs to maintain this suit and the issue of subject matter jurisdiction were settled by the Court of Appeals, provided HUD can be made a party defendant, which has been done.

The Court finds that the suits of the plaintiffs should be dismissed. Order to be entered accordingly.